COFFIN, Chief Judge.
 

 These are cross appeals from a December 23, 1980 order of the district court affirming an October 5, 1979 order of the bankruptcy court. The order precludes appellant Treadway Inns Corporation (Tread-way) from suing in another court appellee Builders Investment Group (BIG) on a three-way contract involving Treadway, BIG and Samoset Associates (Samoset), the bankrupt developer of a Maine coastal resort hotel. Treadway seeks in its appeal to set aside the bar to suing BIG; BIG asserts in its cross-appeal that the district court had no appellate jurisdiction to review the October 5 order.
 

 These appeals are part of the harvest of a seven year period of travail surrounding the building and launching of the Samoset resort in Rockport and Rockland, Maine, whose core was a once-popular summer hotel that had suffered from changing times. Samoset originally agreed, in separate contracts dated January 15, 1973, to retain Treadway as the manager of the resort complex and to operate under the Tread-way franchise. Six months later BIG became Samoset’s major creditor, lending $2,700,000 to the enterprise. The underlying dispute is whether certain contractual undertakings involving Samoset, BIG and Treadway in 1973 and 1974 (the Tripartite and Recognition Agreements), insofar as they referred to the earlier Franchise Agreement between Treadway and Samoset, survived the bankruptcy court’s settlement order, which transferred to BIG the assets of the hotel and all managerial functions, and terminated any role on the part of Treadway. Treadway claims that the bankruptcy court lacked jurisdiction to bar its suit against BIG because (1) BIG, by signing the Tripartite Agreement and the amended or Recognition Agreement, whether “wittingly or not”, bound itself directly to Treadway and the subsequent bankrupt
 
 *249
 
 cy of Samoset and negotiations between the Trustee and BIG resulting in the settlement order had no effect on the earlier freestanding BIG-Treadway undertakings; and (2) even if the bankruptcy court at one time had jurisdiction to determine Treadway’s rights against BIG, it lost such jurisdiction when the assets were conveyed to BIG.
 

 Critical to our understanding of this controversy is an acquaintance with the two agreements Samoset entered into with Treadway. While one of them, the Management Agreement, plays no role in these appeals,
 
 [1]
 
 the other is to this drama as is the prince’s father to “Hamlet”; it is the stimulus of this litigation, yet offstage during most of the action. Both Agreements provided for a twenty-five year duration. The Management Agreement covered Tread-way’s obligations to provide such services as credit card, affiliation reservation, sales promotion, food, personnel hiring, training and supervision, accounting, and budgeting, and its right to make alterations and improvements.
 

 The Franchise Agreement provided that the franchisee accept the agreement “subject to the Management Agreement”, use the marks, signs, etc. of Treadway; that Treadway conduct national and chain-wide promotions, for a monthly fee of .5 percent of room sales; that additional monthly fees be paid in amounts equal to 3 percent of room sales and 1 percent of food and beverage sales; and that Treadway have the following rights:
 

 —to inspect at any time;
 

 —to have access to all records;
 

 —to select the auditor;
 

 —to determine operational standards and procedures;
 

 —to determine all matters requiring uniformity (such as decoration, decor, the frequency of painting and repairing, the specifications and lay-out of furnishings, standards for food products, employees and advertising);
 

 —to require use of the food, supplies and equipment of Treadway-approved suppliers;
 

 —to approve all furniture and fixtures proposed to be installed;
 

 —to proscribe affiliation with any other hotel group;
 

 —to approve types, limits, and providers of insurance coverage;
 

 —to approve any transfer of the Inn or equipment, or controlling interest in the corporation owning the Inn or any public financing.
 

 On June 18, 1973, in connection with advancing $2,700,000 to Samoset, BIG signed the Tripartite Agreement, along with Samoset and Treadway. This provided for assignment of Samoset’s interest to BIG in the event of default, in which ease BIG would have the responsibility of advancing working capital and franchise payments to Treadway, and the right to assign its interest in the Franchise and Management Agreements to any financially responsible nominee who assumed those obligations. On September 11, 1974, in connection with BIG’s advancing $72,000 more for the hotel’s start-up and opening costs, the three parties amended the first Tripartite Agreement by executing a similar Recognition Agreement. BIG’s obligation to advance working capital and franchise fees was made conditional not only on Samoset’s default but on whether it “succeeds to Franchisee’s interests under the Franchise and Management Agreements”.
 

 On November 10, 1975 after Samoset had defaulted and BIG had commenced proceedings to foreclose on its mortgage, Samoset petitioned in the bankruptcy court for Chapter XII relief. On July 12, 1977 the bankruptcy judge entered an order constituting Samoset a debtor-in-possession, and requiring Treadway and Samoset to contin
 
 *250
 
 ue their relationship under the Management Agreement, with certain changes. The order suspended BIG’s obligation under the Tripartite Agreement (it “being a conditional assignment by [Samoset] to BIG of [Samoset’s] rights under the Management Agreement”), and ordered that any controversies thereafter arising among Samoset, BIG, and Treadway regarding operations under this order or the effect on their liability of provisions of the Tripartite Agreement as amended be submitted to it for summary adjudication. It enjoined any other court action relating to the Agreement without prior approval of the bankruptcy court.
 

 Straight bankruptcy proceedings ensued. On March 1, 1978 the bankruptcy court determined that the Chapter XII petition had not been filed in good faith and on March 8, 1978 appointed a Trustee. The Trustee did not assume either the Management or Franchise Agreement within sixty days. Instead, he negotiated a settlement and on June 15, 1978 sought authority to compromise, giving notice to all parties and filing a Stipulation. This latter document set forth the Trustee’s proposed undertaking to allow BIG’s claim at a reduced amount, to terminate all stays of foreclosure, and to convey his interest to BIG subject to payment of certain liens and other encumbrances. BIG’s reciprocal undertaking was to pay to the estate an additional $200,000 and to satisfy certain listed lien claims.
 

 The fifth and last section of the Stipulation concerned Treadway. The Trustee and BIG agreed that (1) Treadway should continue to operate the hotel until the date of closing; (2) “although the so-called Management and Franchise Agreements . . . have been rejected by reason of the failure of the Trustee to assume the same (and thereby terminated by operation of law), Treadway . . . should continue to compensate itself out of the operating funds in its hands ... in full compensation for its management and franchise services. It is understood that BIG is not assuming any Treadway contracts.”; (3) “as of closing BIG will assume the managerial functions .... It is expressly understood that as of the day of closing any role or function of Treadway shall be terminated”; (4) funds in the amount of some $51,000 would be maintained “to preserve the estate against claims of Treadway .. . emanating from the rejection of executory contracts.”
 

 On July 17, 1978, at a hearing on this application, all parties were represented by counsel and no objections were voiced. On July 20 the bankruptcy judge issued his order approving the compromise, finding it fair, reasonable, and in the best interest of the estate, and ordering that, as of the date of closing, August 15, 1978,
 

 “BIG shall assume ... all managerial functions . . . and as of said date any role or function of Treadway Inns Corporation with respect to such management shall be terminated.”
 

 At this point in the litigation, procedural motions proliferated in a kind of metastasis. Although Treadway’s “first motion” to exempt contractual litigation between it and BIG from the July 20, 1978 order was denied as being without merit, Treadway did not pursue its appeal. Instead, it renewed its efforts in three subsequent motions. Finally, a year later, on August 23, 1979, the bankruptcy judge issued his memorandum of decision which is the basis of his final order of October 5.
 

 In that memorandum, he stated that the compromise order, approved on July 20, 1978, terminated Treadway’s management rights and obligations as of the date of closing, but did not purport to adjudicate other rights of Treadway against either the Trustee or BIG, leaving Treadway free to pursue any such rights in the bankruptcy court. The bankruptcy judge acknowledged that third-party controversies not involving the bankrupt or the property of the estate are not within the jurisdiction of the bankruptcy court but held that (a) the
 
 *251
 
 rights and obligations of BIG and Treadway arising out of the operation of the hotel during the bankruptcy proceedings were so intertwined with and controlled by the latter that they may be determined by the court; and (b) the inherent equitable jurisdiction of the bankruptcy court must embrace protection of the integrity of the judicial sale of the hotel to BIG.
 

 The court then examined the various counts in the complaint that Treadway proposed to file against BIG in the New Jersey courts. The “First Cause of Action” sought injunctive relief to force BIG “to comply with its obligation to [Treadway], including reinstatement of [Treadway’s] franchise, and all incidents thereof”, together with an accounting and damages to the date of reinstatement. The second and third causes were similar in nature and in the relief sought. The bankruptcy court noted that any obligation owed by BIG to Treadway was limited to
 
 payments
 
 provided in the Franchise and Management Agreements and that even these were contingent on BIG
 
 succeeding
 
 to Samoset’s interest. The court concluded that Treadway had not satisfactorily persuaded it that BIG’s rights had any other origin than by purchase from the Trustee. It also found the demands for an accounting and damages defective in that they did not exclude the period of operations under the aegis of the bankruptcy court. The court therefore ruled that the first three causes of action had not been shown appropriate for a nonbankruptcy forum, i. e., that pursuit of them in such forum would not embarrass the bankruptcy court in exercising its exclusive jurisdiction over matters directly involved with the bankrupt estate. It did allow Treadway to pursue non-contractual actions based on unjust enrichment, the improper solicitation of Treadway employees, and unfair trade practice in any appropriate forum.
 

 The appealability of the October 5, 1979 order, the subject of BIG’s cross-appeal, may be disposed of briefly. BIG’s contention is that the order decided nothing that was not implicit in the July 20, 1978 order, from which no appeal was ever perfected. We have some sympathy with BIG’s argument that had Treadway pursued its appeal of the July 20, 1978 order, the district court would have settled the scope of that order without subjecting the estate and the parties to a year of repetitive motions and uncertainty, a situation justly labelled by the district court as “incredibly complex and ridiculous”.
 

 Yet the district court, after hearing, thoughtfully concluded that the July 20, 1978 order had not addressed the question of the jurisdiction of the bankruptcy court to enjoin any action to enforce Treadway’s contract claims against BIG in another court. Indeed, the July 20, 1978 order merely spoke to the issue of who was to have all managerial functions of the hotel (BIG) and who was to have none (Tread-way). Even the “First Motion” of Tread-way to alter that order sought only to preserve issues of contractual rights and obligations of BIG and Treadway, without reference to forum. We find no error in the conclusion of the district court that the October 5, 1979 order was an appealable one.
 

 This brings us to the merits of Tread-way’s appeal. Treadway’s first claim is that the Recognition Agreement, which amended the Tripartite Agreement, indissolubly and permanently fixed BIG’s obligations to Treadway. As counsel put it in argument to the district court, “It’s Tread-way’s position that BIG, whether wittingly or not, signed up for the term of those [Management and Franchise] agreements, and that BIG could not terminate those agreements through the bankruptcy of a third party”. We think the “wittingly or not” observation was well taken, since it may be doubted that BIG, having succored the ailing Samoset to the tune of $2,772,000, was anxious to bind itself for a quarter of a century to Treadway even if Samoset should entirely fail.
 

 
 *252
 
 The awkwardness of declaring this particular third-party contract utterly disconnected with the bankrupt estate, and therefore off limits to the bankruptcy court, can be seen if we envisage the sale of the premises to a stranger to these proceedings, Corporation X. In that circumstance Corporation X would have the hotel to manage or do with as it wished. But BIG would remain (on Treadway’s theory) obligated to use Treadway’s signs and services, obtain its approval for equipment, food, and supplies, or at least (to follow the wording in the Recognition Agreement) to make franchise payments and to find a financially responsible successor who would assume all obligations. The coexistence of Corporation X and such a successor of BIG is beyond our capacity to comprehend.
 

 There is another conceptual difficulty. What began as one set of rights and obligations running between Samoset and Tread-way has now, under Treadway’s theory, become two. The assignment of Samoset’s interests to BIG was a conditional one, in the nature of collateral security for BIG’s loan. Should Samoset default, BIG would step into Samoset’s shoes, with all the former’s rights and obligations. But when Samoset actually defaulted, the prior arrangement with BIG did not come to pass. The bankruptcy court took charge, first ordering a debtor-in-possession administration, then appointing a trustee. The Trustee subsequently, by not assuming the Franchise Agreement, rejected it. It thus appears to us that Samoset’s “interest” under the Franchise Agreement was extinguished and therefore did not survive to be assumed by BIG. Yet Treadway would have us believe that somehow a second set of Samoset’s obligations to Treadway survived the preemptive administration of the bankruptcy court and the Trustee’s rejection.
 

 We need not, however, rest on our difficulty of conceptualizing Treadway’s argument on the creation and survival of any independent obligation to it on the part of BIG. Even if the Recognition Agreement did create some independent obligations running from BIG to Treadway, they clearly had properly come under the jurisdiction of the bankruptcy court by the time of the hearing on the Compromise Order of July 20, 1978. Unaccountably, Treadway asserts in its brief that the Franchise Agreement was not mentioned in either the Stipulation or the Order. As we have noted, the Stipulation explicitly referred to the Franchise Agreement and the understanding of both the Trustee and BIG that neither was assuming
 
 any
 
 Treadway contract.
 

 Not only did Treadway have very complete notice of what was contemplated, but it voiced no objections to the Trustee’s proposals, even though
 
 all
 
 managerial functions were to be assumed by BIG. While Treadway overlooks the emphasis given the Franchise Agreement in the Stipulation, it stresses the absence of reference to such Agreement in the July 20, 1978 order. But that order did not refer to either the Management or Franchise Agreement. It referred to the generic subject of management, which it properly had to view as an indivisible one. There was much management in the Franchise Agreement, as our earlier review of that Agreement demonstrates. The court simply could not have dealt effectively with the hotel property if it had attempted to reserve from the control of the buyer the extensive management functions listed in the Franchise Agreement. Treadway would have it that the July 20, 1978 order gave all managerial functions to BIG — except that Treadway was to select the auditor, determine operational standards, approve decor and layout, determine frequency of painting and repairing, approve all food, supply, equipment, and insurance purchases, and pass on any proposed transfer of property or public financing. To read the Franchise Agreement is to expose the frailty of the argument.
 

 By the same token, if Treadway were allowed to sue BIG in New Jersey, seeking reinstatement of “all incidents” of the Franchise Agreement, the interpretation of
 
 *253
 
 the bankruptcy judge’s order of July 20, 1978 would be at issue. BIG would be defending ground it thought it had won. It conceivably could implead the Trustee. And, if it lost, it arguably could successfully seek to reopen the terms of settlement of the estate. All such possibilities are unseemly.
 

 What authority we have discovered defining the jurisdiction of the bankruptcy court in similar situations confirms our view that the contested order was within the bankruptcy court’s power to make. Because the predicate of bankruptcy jurisdiction is the possession of property, once the bankrupt estate is settled and transfer of the bankrupt’s property is executed, “the jurisdiction of the bankruptcy court over the property is generally said to terminate and does not follow it .... ” 4B Collier on Bankruptcy ¶ 70.98[18], at 1198 (14th ed. 1978);
 
 accord, Nixon v. Michaels,
 
 38 F.2d 420 (8th Cir. 1930). This general principle is subject, however, to the qualification that the bankruptcy court may nevertheless exercise jurisdiction “over a dispute involving the rights and priorities of private parties after a sale where the dispute involves a review and clarification of the bankruptcy proceedings leading to the sale.”
 
 Collier, supra,
 
 at 1198 n.13. Similarly, the bankruptcy court may not, as a general rule, adjudicate disputes between third parties not involving the bankrupt or his property,
 
 Evarts v. Eloy Gin Corp.,
 
 204 F.2d 712, 717 (9th Cir. 1953), but it may determine third-party disputes when necessary to administer the estate completely,
 
 O’Dell v. United States,
 
 326 F.2d 451, 455 (10th Cir. 1964);
 
 see
 
 5A Remington On Bankruptcy, § 2352, at 20 (5th ed. 1953) (1978 cum. supp.).
 

 It is a fact-specific inquiry whether a post-transfer or third-party dispute is collateral to or intimately bound up with the bankruptcy administration. We think that
 
 In re Paddock of California,
 
 226 F.Supp. 43 (S.D.Cal.1964), relied upon by Treadway, offers a good illustration of a truly collateral dispute. In
 
 Paddock,
 
 a Chapter XI receiver sold assets of the debtor including three trade names, and agreed to defend the purchaser against unauthorized use of the names. After the sale, the Trustee invoked the jurisdiction of the bankruptcy court to enjoin use of one of the names by a complete stranger to the bankruptcy proceedings. The district court upheld an objection to bankruptcy jurisdiction, holding that the contractual undertaking of the Trustee could not extend bankruptcy jurisdiction to post-bankruptcy disputes unrelated to the administration of the estate.
 

 The facts of
 
 Paddock
 
 are, we think, a far cry from those presented here. Treadway was no stranger to the bankruptcy proceedings. Although not a party to the compromise, Treadway had notice and an opportunity to be heard before the compromise was approved. It appeared, but failed to enter an objection. More importantly, perhaps, during the pendency of the bankruptcy proceedings, the bankruptcy court exercised extensive control over the Tripartite Agreement, as amended — the subject matter out of which the BIG-Treadway dispute arises. It expressly contemplated adjudication of any such disputes before the bankruptcy court. By contrast, neither the party nor the dispute in
 
 MPaddock
 
 was in any sense before the bankruptcy court while the bankruptcy proceedings were alive.
 

 In
 
 Baker & Taylor Drilling Co. v. Stafford,
 
 369 F.2d 551 (9th Cir. 1966), also cited by Treadway, the court dissolved on collat-eralness grounds a bankruptcy court injunction restraining suit by a mechanic’s lienor against a partner of the debtor. The partner of the debtor had contracted with the lienor to drill a gas well in which the partner and the debtor were to have separate undivided interests. The court held that litigation affecting the partner’s interest in the well would not necessarily affect the reorganization of the debtor because the interest of each was separately alienable: “Undivided fractional interests in mineral leases are readily saleable, and presumably a creditor can reach the interest of an own
 
 *254
 
 er of one fractional share without affecting the interest of other owners.”
 
 Id.
 
 at 556. In this case, Treadway does not urge that balkanized management would be a feasible or desirable result. Indeed, the Tripartite and Recognition Agreements, the interim operating order and the settlement order all contemplate unitary control of management in one party or another.
 

 The bankruptcy court unquestionably had the power during the pendency of the liquidation proceeding to determine rights arising from the parties’ trilateral undertakings. Although the bankruptcy court’s initial disposition of Treadway’s rights did not completely exclude the possibility of later claims against BIG, the waters were sufficiently muddy in this regard that the clarification and construction of the earlier proceedings were subjects in which the court had interest and jurisdiction.
 
 See Rosehedge Corporation v. Sterett,
 
 274 F.2d 786 (9th Cir. 1960). Accordingly, we conclude that the matter of Treadway’s surviving rights against BIG under the three-way agreement entered into with the bankrupt “was still a matter very much in the bosom of the court”,
 
 In re Stockman Development Co.,
 
 447 F.2d 387, 396 (9th Cir. 1971), and therefore within its jurisdiction.
 
 [2]
 

 In brief, this case presented the bankruptcy court with a property and many contesting claims and parties. The effective administration of the bankrupt estate in the interests of the creditors and in the public interest required that the court be able to approve the conveyance of the facility to a buyer who could operate it. Such a conveyance necessarily required that it be able to grant all managerial powers, from whatever source derived, to one and to withhold such from all others. The court was within the proper exercise of its discretion in determining that litigation in any other forum concerning an agreement trenching materially on managerial powers would be a source of frustration and embarrassment.
 

 The judgment is affirmed.
 

 [1]
 

 . By letter dated May 25, 1976 BIG invoked a clause allowing it to terminate this agreement by tendering $15,000 as liquidated damages.
 

 [2]
 

 . We see no significant distinction in the fact that the conveyance to BIG of the real property in the estate was accomplished by means of a mortgage foreclosure rather than by the ordinary device of a judicial sale. The transfer was for consideration and was conducted with the express approval of the bankruptcy court in lieu of a more conventional judicial sale. The interest of the court in protecting the integrity of its disposition of the estate is equally great in either case.