EASTERBROOK, Circuit Judge.
Both Elscint, Inc., and First Wisconsin Financial Corp. had security interests in receivables of Xonics Medical Systems, Inc., one of a group of related corporations. Elscint acted as collection agent for itself *129 and First Wisconsin, paying over funds attributable to the accounts in which First Wisconsin had an interest. After the Xonics group filed petitions in bankruptcy, Elscint asked the bankruptcy court to appoint the U.S. Trustee as an escrow agent to hold the proceeds. The court did so, but after four months the Trustee asked to be relieved of the duty. In July 1984 the bankruptcy court approved, and entered as an order of the court, an agreement between Elscint and First Wisconsin under which American National Bank and Trust Co. of Chicago held the funds. The Bank was to keep the funds until the claimants’ lawyers certified that they had “reached agreement on the ownership and manner of distribution thereof.”
In September 1984 Elscint and First Wisconsin agreed that about $280,000 of the money in the account belonged to Elscint and $120,000 to First Wisconsin. First Wisconsin withdrew its share immediately. Elscint did not, because it was using the balance to secure payments to the Xonics estate for some of the bankrupts’ property Elscint had purchased. After completing the purchase in November, Elscint tried to withdraw the $280,000. First Wisconsin instructed its attorneys and the Bank not to release the money, however. It wanted to renegotiate its agreement, which it said had been based on misrepresentations by Elscint. In December 1984 Elscint asked the bankruptcy judge to hold First Wisconsin in contempt. The judge refused in June 1985, on the ground that the failure of the parties to agree is “not a contempt type of problem”, and invited Elscint to “come in on another motion.” Elscint did, asking the court to direct First Wisconsin to permit the disbursement of the $280,000.
The bankruptcy court addressed this motion on August 28, 1985, the day on which it confirmed the Xonics group’s plan of reorganization. The plan formally abandoned the accounts receivable in which Elscint and First Wisconsin had interests. See 11 U.S.C. § 554(a). The bankruptcy judge then concluded that because the plan abandoned the property, the escrow account was no longer subject to the court’s jurisdiction. According to the judge, only the state courts may resolve competing claims to property abandoned by a bankrupt. The district court affirmed, explaining: “That the property at issue may at one time have been a part of the debtor’s estate does not give the bankruptcy court, a court of extremely limited jurisdiction, the power to resolve disputes concerning the property after the debtor has disclaimed any interest in the property.”
We recently held that a district court’s refusal to order the disbursement of a pool of money, pending further litigation, is not an appealable final order. Uehlein v. Jackson National Life Ins. Co., 794 F.2d 300 (7th Cir.1986). In Uehlein all further litigation would be held in federal court, ultimately producing an appealable final decision; here it will be held in state court. Viewing the dispute about the $280,000 as a single piece of litigation, the order is final, just as if Elscint had filed a diversity suit that had been dismissed. The district court has wrapped up all federal litigation about the money. Appellate jurisdiction in bankruptcy disputes is complicated, however, by the presence of continuing litigation. Although the plan of reorganization has been confirmed, the exact interest of each creditor has not been ascertained. Indeed, the shares may depend on who gets the money from the escrow account, a matter we discuss later. In ordinary civil litigation the existence of such ongoing disputes would prevent the taking of an appeal. Bankruptcy cases, however, comprise many disputes that would be independent lawsuits, and In re Morse Electric Co., 805 F.2d 262, 263-65 (7th Cir.1986), holds that an order that would be a final judgment in a stand-alone dispute outside of bankruptcy also is a “final decision” permitting an appeal under 28 U.S.C. § 158(d). See also In re Wagner, 808 F.2d 542, 544-45 (7th Cir.1986); In re Sax, 796 F.2d 994 (7th Cir.1986); In re Cash Currency Exchange, Inc., 762 F.2d 542 (7th Cir.1985). The district judge has resolved all pending questions concerning the fund held by the Bank; it will never revisit the subject as part of another order (indeed, the unresolved dispute may pre *130 vent final distribution of the estate’s assets and so prevent entry of a “final” order closing the case); outside of bankruptcy, a conclusive disposition of claims to assets would be a final decision in a stand-alone suit; therefore it is an appealable order.[1]
The conclusion that we have jurisdiction leaves the question of the bankruptcy court’s jurisdiction. Elscint contends that the bankruptcy court could determine ownership of the fund because of its continuing power to enforce its orders. The Bank holds the money under an order entered by the court. Doubtless courts may enforce their orders. E.g., In re Samoset Associates, 654 F.2d 247, 253-54 (1st Cir. 1981); see also McCall-Bey v. Franzen, 777 F.2d 1178, 1183 (7th Cir.1985). Yet that principle helps Elscint only if a court must construe the order to determine whether First Wisconsin is entitled to refuse to authorize the Bank to pay the money. The order simply allows Elscint to deposit the money in the Bank and provides that the parties’ attorneys shall release the money when the parties agree. It does not compel anyone to agree, or provide a mechanism to resolve disagreements. The rights of the parties to the money must be resolved without reference to the court’s order.
Elscint observes that the earlier order naming the U.S. Trustee as stakeholder prohibited either side from claiming fraud as a reason to block a payout. (Fraud might be a basis of litigation after a payout, though.) These terms were not carried over to the second agreement, however, and the bankruptcy court did not read the terms of the first agreement into the second by implication. The court’s treatment of its own order — which treats the order as meaning exactly what it says — is entitled to respect.
Court orders should be read, when possible, to preserve the essential character of a dispute. This dispute is about ownership of money, and it is based on conflicting readings of the contracts under which Elscint acquired its interests in the accounts. The dispute, in other words, is the sort ordinarily resolved by state courts under the common law of contract and the Uniform Commercial Code. It should be resolved in the usual forum and under the usual rules, see 28 U.S.C. § 1652, unless the federal order plainly supplies a new rule of decision. It does not. Elscint may not use the order as a basis of jurisdiction. See In re Chicago, Rock Island & Pacific R.R., 794 F.2d 1182, 1186-88 (7th Cir.1986) (Sanborn II).
First Wisconsin, for its part, tries to persuade us that principles of issue preclusion block Elscint’s claim. According to First Wisconsin, the bankruptcy judge’s refusal to hold it in contempt of court disposed of Elscint’s claim. When Elscint neglected to appeal, the disposition became final and may not now be disturbed. This is wrong for two reasons. One, the bankruptcy judge explicitly said that contempt is the wrong remedy; he did not purport to resolve the merits of the dispute. Two, a judge’s refusal to hold a party in civil contempt of court is not an appealable final order when other parts of the litigation remain unresolved. Fox v. Capital Co., 299 U.S. 105, 57 S.Ct. 57, 81 L.Ed. 67 (1936); Sportmart, Inc. v. Wolverine World Wide, Inc., 601 F.2d 313, 315-16 (7th Cir.1979). It is one of many interlocutory decisions on the way to judgment. Adverse decisions on interlocutory matters *131 may be saved up to be appealed at the end of the case. Exchange National Bank v. Daniels, 763 F.2d 286, 290 (7th Cir.1985). That is what Elscint did. We have an appeal from the only “final” decision, and in such an appeal all questions are open.
Elscint’s principal argument is that once a bankruptcy court acquires jurisdiction of a dispute, the power to decide lasts forever. The accounts receivable of Xonics and related firms were property of the estate under 11 U.S.C. § 541(a). Adjusting competing claims of creditors to the property of a bankrupt is the central function of bankruptcy law. Elscint and First Wisconsin disagree about which has a security interest in which payments. The bankruptcy court had jurisdiction of disputes of this kind under 28 U.S.C. § 157(b)(2)(K) and (O) at the outset of the case. See Rainey v. International Harvester Credit Corp., 59 B.R. 987 (N.D.Ill.1986). But Sanborn II establishes that jurisdiction does not follow the property. It lapses when property leaves the estate. Sanborn II dealt with a dispute between the former tenant of the bankrupt and the person who purchased the property from the bankrupt. While the property belonged to the estate, the court was empowered to adjudicate rental disputes. Sanborn II concluded that once the property has been sold the court needs a new source of jurisdiction (such as diversity), if the dispute is to remain in federal court, and this is so even if the parties’ anticipation about the outcome of future disputes with tenants affects the price the estate can charge for the property. Id. at 1188; In re Crystal Manufacturing & Packaging, Inc., 60 B.R. 816, 818-19 (N.D.Ill.1986). Otherwise anyone who could trace his title to a bankrupt could invoke federal jurisdiction to settle disputes affecting that property.
The principle of Sanborn II is not limited to sales. Suppose A, B, and C claim interests in a pool of oil. If A is a bankrupt, the bankruptcy court could determine the interests of all three in the property under 28 U.S.C. § 157(b)(2) or § 157(c)(1), because only after identifying the “property” of the estate may the court apportion that property among creditors. But if the estate should disclaim any interest in the pool, only the dispute between B and C would remain. The resolution of that dispute would not affect the creditors of the bankrupt, and there would be no source of jurisdiction. That B and C might also be creditors of the bankrupt would not enlarge the court’s power; there is no jurisdiction to resolve all disputes among creditors of a bankrupt. There is jurisdiction under § 157(c)(1) only when the dispute is “related to” the bankruptcy — meaning that it affects the amount of property available for distribution or the allocation of property among creditors. In re Paso del Norte Oil Co., 755 F.2d 421 (5th Cir.1985); Pacor, Inc. v. Higgins, 743 F.2d 984, 994-96 (3d Cir.1984).[2] The bankruptcy jurisdiction is designed to provide a single forum for dealing with all claims to the bankrupt’s assets. It extends no farther than its purpose. That two creditors have an internecine conflict is of no moment, once all disputes about their stakes in the bankrupt’s property have been resolved. Cf. Owen Equipment & Erection Co. v. Kroger, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978) (same principle outside of bankruptcy law — a cross-claim between defendants requires a new source of federal jurisdiction when it does not affect the disposition of the claim that supplied the original federal jurisdiction). The unrelated dispute among two creditors also would not be a “core” proceeding under § 157(b)(2); it is the relation of dispute to estate, and not of party to estate, that establishes jurisdiction.
This case does not involve the identification of the bankrupt’s property interests. It is a conflict among creditors claiming money that was once unquestionably the property of the Xonics group of corporations. As we have said, resolving competing claims to property that belonged to the debtor when it filed a petition in bankrupt *132 cy is one of the central functions of bankruptcy law. See Thomas H. Jackson, The Logic and Limits of Bankruptcy Law 7-19 (1986). The only reason why this particular dispute might be treated otherwise is the debtor’s “abandonment” of its claim to these receivables.
Sometimes the practical effect of abandonment is to fold up the' bankruptcy case, to remit claimants to the “abandoned” assets to whatever remedies they have at state law. That happened here. Xonics “satisfied” all of its secured claims by abandoning the underlying property to the secured creditors. When the disposition of the abandoned assets cannot possibly affect other creditors, there is no reason for the bankruptcy court’s jurisdiction to linger. A party believing that competing claims to the abandoned assets should be resolved by the bankruptcy court must object to the abandonment, and if it does not persuade the bankruptcy judge, it may appeal the confirmation of the plan that abandons the assets. (Elscint neither objected to the abandonment of the receivables nor appealed from the confirmation of the plan.)
Yet there could be a link between the disposition of claims to abandoned property and the treatment of other creditors. A plan of reorganization might say: “The estate abandons all of its claims to the Empire State Building. To the extent Creditor A receives any money on account of its claims against the Empire State Building, this money shall be counted toward satisfaction of its other, outstanding debt.” If a reduction of A’s debt left more money for Creditor C (who had never claimed an interest in the Empire State Building), then the decision who owned the Empire State Building still would be important to the winding up of the estate. There would be jurisdiction in the district court— and in the bankruptcy court on the parties’ consent — under § 157(c)(1).[3] Cf. In re Friendship Medical Center, Ltd., 710 F.2d 1297, 1302 (7th Cir.1983), suggesting that a district court has jurisdiction of disputes among creditors when it is otherwise “impossible to administer completely the bankrupt’s estate”. Applied to this case, § 157(c)(1) supplies jurisdiction if the identification of ownership interests in the $280,-000 fund would affect the recoveries of other creditors under the plan of reorganization.
Unfortunately Elscint and First Wisconsin do not agree on whether the allocation matters. The plan of reorganization sets aside about $1.3 million for unsecured creditors, and Elscint has an unsecured claim of $12 million. Elscint contends that any money it recovers from the $280,000 will reduce its unsecured claim and therefore increase the recoveries of other creditors from the $1.3 million. First Wisconsin contended at oral argument that the other creditors will do equally well no matter what happens to the $280,000. The district court did not address this question, because it took the view that once the estate abandoned the receivables nothing else mattered. We conclude that effects on other creditors do matter. If the payments to creditors other than Elscint and First Wisconsin under the plan of reorganization depend on the disposition of the competing claims to the $280,000, then the district court has jurisdiction under § 157(c)(1), and if not, not. That court should have the first opportunity to determine whether such an effect lies in store. First Wisconsin has so far objected to the bankruptcy court’s adjudication of the competing claims to the receivables. Participation in the reorganization is not itself consent to the adjudication of a “related” dispute under § 157(c)(1), at least not when the participating party vocally objects to resolution of a “related” dispute. So the district court must resolve the dispute after obtaining proposed findings from the bankruptcy judge, unless First Wisconsin should con *133 sent explicitly to a decision by the bankruptcy court.[4]
Vacated and Remanded.

. Elscint and First Wisconsin are not involved in any additional disputes in the bankruptcy case. They are, however, parties to an equitable subordination case in the Eastern District of Wisconsin. Elscint’s secured claims against the Xonics firms exceed $22 million, and First Wisconsin’s exceed $17 million. The plan of reorganization dealt with ail secured claims by abandoning the property securing the claim to whichever creditor had the senior interest. The Wisconsin suit will be the forum in which the relative priority between Elscint and First Wisconsin is worked out. This ongoing litigation, in a different court, does not reduce the “finality” of the order concerning the $280,000 fund. Nothing that happens in Wisconsin will affect this fund. It will indefinitely keep the bankruptcy from closing, however, because the plan of reorganization provides that any assets in which First Wisconsin’s claims tire subordinated as a result of the Wisconsin litigation will be added to the pot available for distribution to unsecured'creditors in the Chicago bankruptcy case.

. To the extent In re Lafayette Radio Electronics Corp., 761 F.2d 84 (2d Cir.1985), and In re Salem Mortgage Co., 783 F.2d 626 (6th Cir.1986), take a different view of the "related to” jurisdiction, or otherwise conflict with Sanborn II, we do not follow them.

. There is a possibility that § 157(b)(2)(0) also could supply jurisdiction over a dispute of this character, on the ground that it "affect[s] ... the adjustment of the debtor-creditor or the equity security holder relationship". This is a difficult issue. Because the parties’ briefs do not directly address the use of § 157(b)(2)(0) to provide jurisdiction of disputes that do not affect the payout to creditors that are not parties to the dicputes, we do not decide the question.

. Needless to say, we deny First Wisconsin’s request for attorneys' fees. First Wisconsin believes that Elscint took a frivolous appeal. The request for fees is closer to being frivolous — as is First Wisconsin’s argument that the denial of the motion to hold it in contempt precludes the appeal.