# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 03-3871

HELLER FINANCIAL, INC.,

*Plaintiff-Appellee,*

v.

PRUDENTIAL INSURANCE COMPANY OF AMERICA,

*Defendant-Appellant,*

v.

KEY CORPORATE CAPITAL, INC.,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 03 C 2017—**Harry D. Leinenweber**, *Judge.*

_____

ARGUED MAY 17, 2004—DECIDED JUNE 14, 2004

_____


Before BAUER, POSNER, and EASTERBROOK, *Circuit Judges.*

POSNER, *Circuit Judge.* This interpleader action, in which
the substantive issues are governed by Illinois law, turns on
the interpretation of a loan agreement. The facts are not in
dispute. In a nutshell: Heller agreed to lend American Paper
Group, a manufacturer mainly of envelopes used for

collecting donations at church services, up to $43 million, part in the form of term loans secured by APG's fixed assets and part in the form of a revolving-credit facility secured by inventory, accounts receivable, cash, and any other assets that fluctuate with sales. Heller sold a share in the revolving-credit facility to Key and shares in the term loans to both Key and Prudential. As a result, Heller and Key owned shares in both types of loan, but Prudential just owned a share of the term loans.

APG went broke, and its assets were sold in a bankruptcy sale for $13 million, which was less than the amount owed on the loans. The proceeds were paid to Heller as the agent of the lenders, and after depositing the proceeds in the registry of the district court Heller filed suit under the federal interpleader statute, 28 U.S.C. § 1335, for a judicial determination of the division of the proceeds among the three lenders. Although Heller is not a neutral stakeholder, neutrality is not required for a suit "in the nature of interpleader" authorized by the federal interpleader statute, 28 U.S.C. § 1335(a); *State Farm Fire & Casualty Co. v. Tashire*, 386 U.S. 523, 532 n. 9 (1967); *Indianapolis Colts v. Mayor & City Council of Baltimore*, 733 F.2d 484, 486 (7th Cir. 1984); *Bradley v. Kochenash*, 44 F.3d 166, 168 (2d Cir. 1995); *Ashton v. Josephine Bay Paul & C. Michael Paul Foundation, Inc.*, 918 F.2d 1065, 1069 (2d Cir. 1990), though since all three lenders are citizens of different states, the suit could equally well be maintained under the ordinary diversity jurisdiction. 28 U.S.C. §§ 1332(a)(1), (c)(1). We note as a detail that the bankruptcy court that handled APG's bankruptcy also had jurisdiction over the allocation of the proceeds of the bankruptcy sale among the three lender-creditors. 28 U.S.C. § 1334(b); *In re FedPak Systems, Inc.*, 80 F.3d 207, 213-15 (7th Cir. 1996); *In re Xonics, Inc.*, 813 F.2d 127, 131 (7th Cir. 1987). We don't know why that court failed to exercise that jurisdiction.

The district judge ruled that Heller and Key are entitled to repayment of the entire revolving loan first, with the remaining proceeds from the sale of APG's assets to be allocated to the term loans and divided among the three lenders in proportion to their shares of those loans. Prudential argues that the entire $13 million in proceeds should be shared among the three lenders in proportion to their shares in all the loans added together. Key is on Heller's side of the dispute rather than Prudential's because it has a share of the revolving loan as well as of the term loans.

The judge based his ruling on a provision of one of the contracts that defined the relation between the lenders and APG, the two contracts together constituting what we are calling the "loan agreement." The provision on which the judge relied, section 1.5(C) of the "credit agreement," is captioned "Prepayments from Asset Dispositions" and its first sentence states that "Immediately upon receipt of Net Proceeds [i.e., net of expenses] in excess of $250,000 . . . Borrower shall repay the outstanding principal balance of the Revolving Fund by the amount of such reduction in the Borrowing Base attributable to the Asset Disposition giving rise to such Net Proceeds." The "Borrowing Base" is a measure of the value of APG's inventory and other property available to secure the revolving loan. An "Asset Disposition" is defined as a sale of assets other than in the ordinary course of business. The reason that a sale in the ordinary course does not affect the Borrowing Base and so does not trigger any obligation to pay down the revolving loan is that such a sale is unlikely to affect the value of the collateral for the loan; the asset sold (a church collection envelope, in this case) is quickly replaced by an equivalent asset in order to maintain the borrower's inventory. Section 1.5(C) goes on to authorize APG to reinvest the remaining Net Proceeds of an Asset Disposition (i.e., those that don't have to be repaid in

order to maintain the Borrowing Base at the required level). The section continues that any Net Proceeds that are neither used to pay down the revolving loan nor reinvested "shall [be used to] prepay the Term Loans in an amount equal to the remaining Net Proceeds of such Asset Disposition."

When APG went broke and its assets were sold, the $13 million proceeds of the sale were, Heller argues and the district judge agreed, "Net Proceeds" that had to be used to pay off the revolving loan in its entirety because the Borrowing Base had been reduced to zero—APG no longer had any inventory or other assets with which to secure the loan.

Prudential argues that section 1.5(C) does not apply when the borrower goes out of business. Prudential directs us to section 13 of the other contract that defines the relation between the lenders and the borrower, the "security agreement," which provides that if there's a default the proceeds of any sale of the collateral securing the loans shall (after payment of certain expenses) be applied "to the principal amounts of the Secured Obligations outstanding." No distinction is made between the revolving loan and the term loans.

Both Heller and Prudential (we can ignore Key) argue absurdly that the two contracts constituting the overall loan agreement are perfectly clear on their face, and consistent with this position neither party attempted to present any evidence that might be used to disambiguate a contract that is not clear on its face, evidence for example of how similar conflicts between revolving and term lenders are typically resolved. It is true that section 1.5(C) of the credit agreement and section 13 of the security agreement taken separately are clear within their respective domains. But the domains overlap. Section 1.5(C) is about the revolving loan and section 13 is about insolvency, and it is unclear which governs the repayment of the revolving loan in the event of insolvency.

To say that a contract is clear on its face because all its clauses taken separately are clear is as sensible as saying that a sentence must be clear if each of the words in it is clear. The clarity of a written contract is a property of the entire contract, not of isolated words, sentences, or paragraphs. *Hanson v. McCaw Cellular Communications, Inc.*, 77 F.3d 663, 668 (2d Cir. 1996). "[A] contract must be interpreted as a whole. Sentences are not isolated units of meaning, but take meaning from other sentences in the same document." *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856, 860 (7th Cir. 2002) (citations omitted). The fact that the clauses at issue in this case appear in separate documents of a multidocument loan agreement is a further clue that a purely semantic approach to interpretation is likely to fail.

One of the default rules in insolvency (that is, a rule that governs only if there is no express provision to the contrary, as distinct from a mandatory rule) is that creditors of the same class share pro rata in any proceeds available to repay them. 11 U.S.C. § 726(b); *Begier v. IRS*, 496 U.S. 53, 58 (1990); *Warsco v. Preferred Technical Group*, 258 F.3d 557, 564 (7th Cir. 2001); *United States v. Sabbeth*, 262 F.3d 207, 214 (2d Cir. 2001). So if there are two creditors in the same class, one owed $100,000 and the other $400,000, and $50,000 worth of assets of the debtor is available to pay them, the first creditor gets $10,000 and the second $40,000—proportional equality. Another pertinent default rule, however, is that entitlements in bankruptcy mirror those outside, e.g., *Butner v. United States*, 440 U.S. 48 (1979); *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1361 (7th Cir. 1990), and we know from section 1.5(C) of the credit agreement that proceeds from sales of APG's assets are to be used first to reduce the revolving loan. The second default rule normally trumps, because it places creditors in different classes. But section 13 of the security agreement denotes

Heller, Prudential, and Key as creditors of the same class, namely holders of secured obligations. The default rules cancel, and we have to choose between the two clauses of the loan agreement without those crutches.

Our best guess (no stronger statement is possible) is that section 1.5(C) does not give the revolving loan priority over the term loans in bankruptcy. That section says that when APG receives proceeds in excess of expenses as the result of a sale that reduces the collateral securing the revolving loan, then so much of the proceeds must be used to pay down that loan as is necessary to restore the collateral to its previous level, while any proceeds that remain after that is done may either be reinvested by APG or used to pay down APG's term loans. It seems that section 1.5(C) is concerned with credit adjustments necessitated by the trans-actions of a solvent concern (though not by sales in the ordinary course of business, which do not require repay-ment of the revolving loan in whole or part because they are unlikely to impair the loan's collateral), one that remains in business, needing revolving credit, after the adjustments as before, rather than with a situation in which the loan becomes due and owing as a result of the borrower's defaulting. As long as the borrower continues to draw on the revolving loan, he has to pay it down before the term loans whenever he receives net proceeds from a sale that impairs the revolving loan's collateral. But once the loan has been called because the borrower has defaulted, there is no danger of his continuing to draw on the revolving loan without furnishing adequate collateral. He has no further right to that loan, just as he has no further right to the term loans. *All* the loans become due and owing all at once, and in this situation there is no reason to give preference to one type of loan over the other. The parties could have written into the security agreement a provision subordinating the term loans to the revolving loan, 11 U.S.C. § 510(a), but they didn't.

Our analysis suggests that had the parties thought about the effect of bankruptcy on the respective rights of the revolving and the term lenders, they would have wanted section 13 of the security agreement to govern. It's odd that they didn't think about that effect, since both provisions appear to be standard components of a loan agreement, since loan packages consisting of term and revolving loans are common, and since bankruptcy is common. The parties couldn't enlighten us on this score, and we cannot find any cases construing a similar set of provisions.

Heller and Key, we conclude, are entitled only to their proportionate shares of the entire proceeds from the $13 million sale, treating all the loans as a lump. The judgment is therefore reversed and the case remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*