# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 10-2174

FLORENCE (CAROLYN) CROWE, on behalf of
HAROLD D. CROWE,

*Petitioner*,

*v.*

ZEIGLER COAL COMPANY, *et al.*,

*Respondents.*

Petition for Review of
an Order of the Benefits Review Board.
No. 09-BLA-0429

ARGUED JANUARY 20, 2011—DECIDED JUNE 1, 2011

Before RIPPLE and HAMILTON, *Circuit Judges*, and
MURPHY, *District Judge.*[*]

MURPHY, *District Judge.*

---

[*] The Honorable G. Patrick Murphy of the Southern District
of Illinois, sitting by designation.

## I.  Introduction

In this case, Petitioner Florence Crowe, the widow of Harold D. Crowe, a coal miner formerly employed by Respondent Zeigler Coal Company ("Zeigler"), seeks review of a decision of the Benefits Review Board ("BRB") of the United States Department of Labor ("DOL") affirming a decision of an Administrative Law Judge ("ALJ") to modify an award of benefits to Mr. Crowe under the Black Lung Benefits Act ("BLBA"), 30 U.S.C. §§ 901-45. Named as Respondents in addition to Zeigler are Travelers Companies ("Travelers"), the owner of a surety bond that covers Mr. and Mrs. Crowe's claim against Zeigler, and the Director of the DOL's Office of Workers' Compensation Programs ("OWCP"). In 2004 Zeigler was liquidated in bankruptcy, but Travelers made no application to intervene in the modification proceeding giving rise to the petition in this case until 2008, despite having been on notice of its interest in the proceeding since 2005. The modification proceeding should have been dismissed when Zeigler ceased to be a real party in interest to serve as the proponent of modification, and Zeigler's surety, Travelers, which might have served as a real party in interest in support of modification, failed to seek timely intervention in the modification proceeding. Accordingly, we reverse the BRB's decision and remand this case for reinstatement of the award of benefits to Mr. Crowe.

## II.  Background and Procedural History

As is not infrequently the case in proceedings under the BLBA, the procedural history of this matter is both

lengthy and convoluted. *See, e.g., Peabody Coal Co. v. Director, OWCP*, 165 F.3d 1126, 1127 (7th Cir. 1999) (describing a twenty-four-year-old black lung case as "typically protracted"). In 1981, shortly after retiring from his job with Zeigler, Mr. Crowe filed a claim for benefits with the DOL in which he asserted that he suffered from pneumoconiosis, commonly known as "black lung" disease. At the time Mr. Crowe filed his 1981 claim he was thirty-six years old and had worked as a miner for approximately five years. Subsequently the claim was denied by the DOL as having been abandoned.

In 1990 Mr. Crowe filed a new application for black lung benefits. The medical evidence supporting Mr. Crowe's 1990 claim included: the deposition testimony and treatment history of Dr. Curtis Krock, who had been Mr. Crowe's treating physician in the late 1970s and early 1980s; medical records of various physicians who treated Mr. Crowe in the 1980s and 1990s for respiratory ailments; and evidence specifically developed in connection with the claim. Dr. Krock, a board-certified practitioner in internal medicine and pulmonary disease, gave a deposition in connection with a previous claim by Mr. Crowe against Zeigler with the Illinois Industrial Commission in which Dr. Krock testified that Mr. Crowe had a history of recurrent exposure to rock dust. Dr. Krock's main diagnosis was bronchitis related to exposure to rock dust, although Dr. Krock also found that Mr. Crowe was an occult asthmatic.

Dr. Krock acknowledged that, although it was clear that Mr. Crowe had bronchitis, the diagnosis of

asthma was somewhat more problematical because such a diagnosis typically requires a showing of reversibility, meaning that the patient's pulmonary deficit can be improved through medical intervention. However, Dr. Krock testified that he was satisfied with his diagnosis of asthma because, in examining Mr. Crowe, sometimes Dr. Krock heard Mr. Crowe wheezing and sometimes he did not. Dr. Krock also testified that Mr. Crowe's bronchitis and asthma were industrially-related and that Mr. Crowe was disabled.

In 1994, on appeal from the denial of Mr. Crowe's claim for benefits by a deputy commissioner, ALJ Donald Mosser affirmed the denial of Mr. Crowe's claim. In his order denying benefits, ALJ Mosser denied a request by Zeigler for remand of the case to the District Director for the purpose of developing additional evidence, noting that the record in the case had been left open for a considerable time to allow Zeigler to develop additional medical evidence, yet Zeigler had failed to develop any such additional evidence. On appeal to the BRB, the BRB reversed ALJ Mosser's denial of benefits, finding that Dr. Krock's diagnosis of Mr. Crowe as suffering from industrially-related disabling asthmatic bronchitis with an incapacitating cough may have constituted a diagnosis of legal pneumoconiosis.

On remand from the BRB, ALJ Mosser found in a 1995 opinion that Mr. Crowe was entitled to black lung benefits dated from July 1, 1981, the onset of Mr. Crowe's total disability due to black lung, and that such benefits should be augmented for Mr. Crowe's wife and daughter

for the periods during which Mr. Crowe's wife and daughter qualified as dependents. Zeigler then moved for reconsideration, asserting that Mr. Crowe's 1990 claim was barred because Mr. Crowe's 1981 claim for benefits had been dismissed and because Mr. Crowe had failed to prove a material change in his condition such as to permit him to bring a new claim for benefits. In 1996 ALJ Mosser vacated the award of benefits to Mr. Crowe, and the 1996 order was affirmed by the BRB. Accordingly, Mr. Crowe petitioned this Court for review of the BRB's decision.

This Court held that because the dismissal of Mr. Crowe's 1981 claim for benefit was procedural and not a decision on the merits, Mr. Crowe did not need to prove a material change in his condition between his 1981 claim and his 1990 claim. *See Crowe v. Director, OWCP*, 226 F.3d 609, 613-14 (7th Cir. 2000). The Court pointed out that res judicata or claim preclusion typically does not bar a claim where a finding of preclusion is manifestly unjust. *See id*. Also, the Court noted that Mr. Crowe's failure to prosecute his 1981 claim may have been prompted by advice he received from an employee of the Social Security Administration ("SSA") to the effect that he "shouldn't concern [him]self with the black lung claim so much, because if [he] qualified for disability social security [he] would automatically qualify for black lung benefits." *Id*. at 612 (emphasis omitted).

The Court concluded that, when Mr. Crowe's illiteracy was considered in conjunction with his lack of

representation and the misinformation given to him by the SSA, "it would be unfair and improper to hold that the procedural denial of the petitioner's initial claim is sufficient to deprive him of an opportunity with assistance of counsel to advance his 1990 claim on the merits of his health condition." *Crowe*, 226 F.3d at 613. The Court said also that "it seems clear that there exists significant evidence of Crowe's debilitating lung condition," and urged that the case be resolved "as expeditiously as possible" on remand. *Id.* at 615. The Court therefore remanded the case to the ALJ for further proceedings.

On remand, Zeigler sought to reopen the record or to remand the case to the District Director for the development of additional evidence. In January 2001 ALJ Mosser denied Zeigler's request on the grounds that the company should have been able to anticipate the type of evidence to be developed in the case, regardless of whether it was considered a duplicate claim or an original claim, and because Zeigler had enjoyed ample opportunity to develop evidence and there was no need unnecessarily to prolong the proceedings. In March 2001 ALJ Mosser entered a new order awarding benefits to Mr. Crowe. Thereafter, Zeigler initiated a proceeding for a modification of ALJ Mosser's award of benefits and advised the DOL by letter that it refused to pay the benefits awarded to Mr. Crowe.

In the course of the modification proceeding, which by that time had been assigned to a new ALJ, Robert L. Hillyard, the parties deposed four physicians, Dr. Abdul Dahhan, Dr. Lawrence Repsher, Dr. Joseph Renn, and Dr. Gregory Fino, who were presented by Zeigler as

witnesses. Each of the four witnesses concluded that Mr. Crowe was not suffering from black lung disease because the objective evidence, that is, x-rays and other medical tests, did not support such a diagnosis. In 2003 ALJ Hillyard denied Zeigler's modification petition. In August 2004 the BRB reversed ALJ Hillyard's denial of modification, finding that ALJ Hillyard had placed undue weight on the testimony of Dr. Krock as Mr. Crowe's treating physician, and remanded the case to ALJ Hillyard for further proceedings.

In October 2004, while a motion by Mr. Crowe for reconsideration of the BRB's decision was pending before the BRB, Zeigler's counsel moved to withdraw from the modification proceeding because Horizon Natural Resources ("Horizon"), which was the successor in interest to Zeigler and had been in bankruptcy proceedings since 2002, had been liquidated. In December 2004, following denial of Mr. Crowe's motion for reconsideration, the BRB entered an order "not[ing]" the withdrawal of Zeigler's counsel from the modification proceeding. The DOL, through the Office of the Solicitor of Labor, moved both the BRB and ALJ Hillyard to hold Mr. Crowe's claim in abeyance, stating that time was needed in order to determine whether a surety bond covered the claim and, if no such bond existed, how the Director of the OWCP wished to proceed. In February 2005 the Office of the Solicitor wrote to ALJ Hillyard stating that it had identified a surety bond issued by Aetna Casualty and Surety Company ("Aetna") that covered Mr. Crowe's claim. The letter also was sent to Aetna and the Horizon Liquidating Trust to notify

them that they could seek to intervene in the modification proceeding as parties in interest.

ALJ Hillyard denied the DOL's request to hold Mr. Crowe's claim in abeyance, finding that no insurer yet had been made a party to the modification proceeding and that "[a]dding a new party at this point would be prejudicial to [Mr. Crowe]." On the DOL's motion for reconsideration, ALJ Hillyard acknowledged that, in light of the liquidation of Horizon and Zeigler and the fact that neither Aetna nor the Director of the OWCP had attempted to intervene in the modification proceeding, the proceeding was without a proponent, but nonetheless ordered briefing on the issue of modification to go forward. In Mr. Crowe's opening brief on modification, he argued that the modification proceeding should be dismissed for lack of prosecution, because no party in interest had appeared to advocate for modification.

In July 2005 ALJ Hillyard granted modification of the 2001 award of benefits to Mr. Crowe, denying benefits. In his modification order ALJ Hillyard, though finding both that Mr. Crowe's argument for dismissal of the modification proceeding was "technically accurate" and that Zeigler's request to develop additional medical evidence in support of modification was moot because Zeigler had ceased to exist, nonetheless found that review of Zeigler's evidence in support of modification was required because Zeigler had been a party to the proceeding at one time. On appeal from ALJ Hillyard's modification order, the BRB, like ALJ Hillyard, rejected Mr. Crowe's renewed request for dismissal of the modi-

fication proceeding, finding that Zeigler was a party to the proceeding and that Zeigler's counsel were representing Zeigler's interest. Likewise, the BRB affirmed ALJ Hillyard's decision to credit the evidence of Dr. Dahhan, Dr. Repsher, Dr. Renn, and Dr. Fino. However, the BRB remanded the case for a determination by ALJ Hillyard as to whether modification would render justice under the BLBA.

In February 2008 Travelers filed a "protective motion for conditional intervention" in the modification proceeding, asserting that it was the successor in interest to Aetna and that it might be liable on a surety bond if Mr. Crowe were awarded benefits. On remand from of the case from the BRB, Mr. Crowe argued that a grant of modification would not render justice under the BLBA because Zeigler had refused to pay the 2001 benefits award to Mr. Crowe and had failed diligently to defend against Mr. Crowe's original claim for benefits. In January 2009 ALJ Mosser, to whom the case once again had been assigned, found that Zeigler or its successors in interest had displayed adequate diligence in prosecuting modification and further found that modification rendered justice under the BLBA. Mr. Crowe appealed to the BRB, again asking that the modification proceeding be dismissed by reason of Zeigler's inability, as an entity liquidated in bankruptcy, to pursue such a proceeding. In August 2009 Mr. Crowe died at the age of sixty-five.

In October 2009 the BRB granted Travelers leave to intervene in the appeal from ALJ Mosser's modification

order. On March 18, 2010, the BRB entered an order finding that Travelers had brought a timely request for intervention, because the request to intervene had followed closely upon a decision of this Court showing that Travelers, as Zeigler's surety, was required to intervene to protect its interest. The BRB also affirmed ALJ Mosser's decision to grant modification and to terminate benefits. At the time the BRB affirmed the denial of benefits, it granted Mr. Crowe's widow, Florence Crowe, leave to intervene in this matter and to be substituted for her late husband as the claimant. On May 12, 2010, Mrs. Crowe petitioned this Court for review of the BRB's decision.

## III. Analysis

While technically this appeal is from a decision of the BRB, in reviewing the denial of black lung benefits, the Court must evaluate the judgment of the ALJ, not that of the BRB. *See Collins v. Old Ben Coal Co.*, 861 F.2d 481, 486 (7th Cir. 1988). The Court must determine whether the ALJ's decision is rational, is supported by substantial evidence, and is consistent with the law. *See Migliorini v. Director, OWCP*, 898 F.2d 1292, 1294 (7th Cir. 1990). Although the Court must review the entire record, the Court may not redetermine the facts or substitute its judgment for that of the ALJ. *See Freeman United Coal Mining Co. v. BRB*, 919 F.2d 451, 452 (7th Cir. 1990). The Court's review of questions of law, however, is de novo. *See Peabody Coal Co. v. Vigna*, 22 F.3d 1388, 1393 (7th Cir. 1994). "The [BRB] has the identical scope of

review when sitting as an appellate panel reviewing decisions of the ALJ." *Zettler v. Director, OWCP*, 886 F.2d 831, 834 (7th Cir. 1989). Judicial review of the BRB's decision is limited to whether the BRB adhered to its scope of review and to whether the BRB committed an error of law. *See Old Ben Coal Co. v. Prewitt*, 755 F.2d 588, 589-90 (7th Cir. 1985).

On appeal, Mrs. Crowe presents three issues for the Court's consideration: (1) whether the modification proceeding giving rise to the petition in this case should have been dismissed when Zeigler was liquidated in bankruptcy and no other party intervened as a proponent of modification; (2) whether ALJ Mosser abused his discretion in finding that modification of his 2001 order awarding benefits to Mr. Crowe rendered justice under the BLBA where Zeigler, which never appealed the 2001 order, had willfully refused to pay benefits to Mr. Crowe as ordered, and whether the modification decision was otherwise arbitrary and capricious in ignoring ALJ Mosser's prior findings that Zeigler had not been diligent in defending Mr. Crowe's original claim; and (3) whether the BRB erred in reversing ALJ Hillyard's 2003 order denying modification of the 2001 benefits award where the 2003 order found no error of fact in the 2001 award. Because the Court concurs in Mrs. Crowe's first asserted ground for reversal, it is unnecessary for the Court to address the other two asserted grounds for reversal.

The BLBA provides that any "party in interest . . . including an employer" may request modification of an

award of benefits under the statute. 33 U.S.C. § 922.[1] Also, DOL regulations promulgated pursuant to the BLBA permit any interested person to become a party to a proceeding concerning an award of black lung benefits. Specifically, in addition to identifying a claimant, persons authorized to execute a claim on the claimant's behalf, a coal mine operator, and the Director of the OWCP as proper parties to a black lung claim, the regulations provide that "[a]ny other individual may be made a party if that individual's rights with respect to benefits may be prejudiced by a decision to be made." 20 C.F.R. § 725.360(d). The regulations provide also that an insurance carrier of a coal mine operator is a proper party to a proceeding concerning an award of black lung benefits. *See* 20 C.F.R. § 725.360(a)(4). In general, an award of black lung benefits can be modified by an ALJ only where such modification is desirable in order to render justice under the BLBA. *See O'Keeffe v. Aerojet-General Shipyards, Inc.*, 404 U.S. 254, 255 (1971); *Old Ben Coal Co. v. Director, OWCP*, 292 F.3d 533, 547 (7th Cir. 2002).

In the context of a case specifically involving, as in this case, a claim for black lung benefits against one of Horizon's predecessors in interest, Old Ben Coal Company

---

[1] The statute governing modification of awards of black lung benefits, 33 U.S.C. § 922, in fact is a provision of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901-50. It is incorporated by reference into the BLBA by way of 30 U.S.C. § 932(a). *See Eifler v. OWCP*, 926 F.2d 663, 665 (7th Cir. 1991).

("Old Ben"), this Court held that the predecessor coal mine operator, upon liquidation in bankruptcy, ceased to be a real party in interest to the BLBA proceedings. *See Old Ben Coal Co. v. OWCP*, 476 F.3d 418, 420 (7th Cir. 2007) ("*Old Ben Coal*") ("Old Ben has no possible stake in this litigation. It is therefore not a real party in interest, which is to say a party that has a legally protectable interest in the outcome of the suit. It is a party in name only."). So too in this case: after Zeigler's liquidation in bankruptcy, pursuant to the same order that liquidated Old Ben, then upon Mr. Crowe's request, Zeigler should have been dismissed from this case under elementary principles of prudential standing. *See RK Co. v. See*, 622 F.3d 846, 851 (7th Cir. 2010) (citing *Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 757 (7th Cir. 2008)) (noting that the real-party-in-interest rule is essentially a non-constitutional, prudential limitation on standing).[2]

---

[2] The Court recognizes that standing in administrative proceedings under the BLBA is determined not by Article III of the Constitution but by DOL regulations and applicable statutes. *See, e.g., Gibas v. Saginaw Mining Co.*, 748 F.2d 1112, 1119 (6th Cir. 1984) (Congress may empower the BRB to adjudicate black lung benefits cases); *Kalaris v. Donovan*, 697 F.2d 376, 388 (D.C. Cir. 1983) (the BRB is not an Article III court but may execute "some functions historically performed by judges"). However, at least for purposes of this case, the Court will assume what seems also to have been assumed in *Old Ben Coal*, namely, that tests of non-constitutional standing both in administrative proceedings under the BLBA and in

(continued...)

Equally importantly, in *Old Ben Coal* the Court specifically found that the order liquidating Horizon and its predecessors in interest (including Old Ben and Zeigler), did not make Horizon and its predecessors in interest parties in interest to BLBA proceedings. The liquidation order provided that pending black lung claims against Horizon and its predecessors in interest "shall not be dismissed but instead, allowed to proceed to final adjudication with the applicable debtors as parties." 476 F.3d at 419. The order provided also that "claims that result in benefit awards will not be enforced against the Debtors but rather will form the basis for collection from any other responsible parties therefore, including without limitation, the Debtors' sureties under the black lung statute." *Id*. (brackets omitted). However, the Court found that because the order liquidated Horizon and its predecessors in interest and designated no successors in interest to those entities, the order did not make Horizon and its predecessors in interest viable parties to BLBA proceedings, short of intervention in such proceedings by sureties of Horizon and its predecessors in interest or the DOL. *See id*. at 419-20.[3]

---

[2] (...continued)
suits for judicial review of such proceedings are approximately the same. *See, e.g., Martin-Trigona v. Federal Reserve Bd.*, 509 F.2d 363, 365-66 & n.10 (D.C. Cir. 1974).

[3] This specific portion of the Court's decision in *Old Ben Coal* therefore defeats any claim by Travelers that, after Zeigler was liquidated in bankruptcy, Zeigler nevertheless remained a viable

(continued...)

Because the Court determines that Zeigler was no longer a party in interest to the modification proceeding giving rise to this appeal after Zeigler's liquidation in bankruptcy, the remaining issue to be decided by the Court is an extremely narrow one: whether Travelers sought in a timely manner to intervene in the modification proceeding upon being put on notice of its interest in the proceeding. As already has been noted, applicable DOL regulations permit an insurer of a mine operator and, more broadly, any person whose rights may be affected by a BLBA proceeding, including a modification proceeding, to be made a party to the proceeding. *See* 20 C.F.R. § 725.360(a)(4), (d). Although the regulations do not specify a time within which an insurer or other interested person must seek intervention, it seems reasonable to suppose that the regulations contemplate that an insurer or other person whose interests are likely to be affected by a BLBA proceeding will seek intervention in a timely manner upon being notified of an interest in the proceeding. Thus, the pertinent regulations specifically provide that a request for modification of an order for benefits under the BLBA may be "den[ied] . . . by reason of abandonment." 20 C.F.R. § 725.310(c).

It is apparent to the Court that Travelers did not seek timely intervention in the modification proceeding at issue in this case. As noted, no later than February 2005,

---

[3] (...continued)
party to the modification proceeding at issue in this case by virtue of the bankruptcy court's order liquidating Zeigler.

when the DOL invited Aetna, the predecessor in interest of Travelers, to intervene in the proceeding, Travelers was on notice that, by virtue of the surety bond issued to Zeigler covering Mr. Crowe's claim, Travelers had an interest that might be impaired by the proceeding, were Travelers, as Zeigler's surety, required to pay Mr. Crowe's claim against Zeigler. Travelers argues that its petition for intervention in the modification proceeding was timely because the petition followed closely upon this Court's decision in *Zeigler Coal Co. v. OWCP*, 490 F.3d 609 (7th Cir. 2007) ("*Zeigler Coal*"). Until the Court rendered its decision in *Zeigler Coal*, Travelers argues, the surety was unaware that it needed to intervene in the modification proceeding to protect its rights. In *Zeigler Coal*, the Court found that a surety of Zeigler was entitled to intervene in a proceeding for benefits under the BLBA, where the surety had not been aware of its obligation to intervene until this Court rendered its decision in *Old Ben Coal* earlier in the same year. *See Zeigler Coal*, 490 F.3d at 610 n.1. The Court finds the reliance of Travelers on *Zeigler Coal* to be misplaced.

Most importantly for purposes of this case, nothing in the *Zeigler Coal* decision in any way amplified or enlarged upon the Court's basic holding in *Old Ben Coal*. In the *Old Ben Coal* decision, as already has been discussed, the Court found that Old Ben, having been liquidated in bankruptcy and having no "palpable existence or successor," was not a real party in interest to a proceeding under the BLBA and thus dismissed the case. 476 F.3d at 419. In *Old Ben Coal* the Court held further that "[a]ny entity, such as an insurance company

or a surety, that would be prejudiced by an award of black lung benefits is entitled to intervene in the administrative proceeding with the rights of a party." *Id*. at 420 (citing 20 C.F.R. § 725.360(a)(4), (d)). In light of these unambiguous pronouncements in *Old Ben Coal*, even assuming for the sake of argument that the notice given to Travelers in 2005 by the DOL was insufficient to alert Travelers to the need to intervene in the modification proceeding at issue in this case, it is difficult to understand why Traveler waited until over a year after the Court handed down the *Old Ben Coal* decision to seek intervention in the modification proceeding.[4]

What appears most plausible to the Court from the record of this case (and what Travelers more or less has owned up to both in its written submissions to the Court and at oral argument in this appeal) is that Travelers made a tactical decision to stay out of the modification proceeding at issue here for as long as it could do so. Finally, Travelers sought leave to intervene in the modification proceeding only when the surety concluded that it could no longer sit on the sidelines without risking a finding that the claim for

---

[4] It also is worth noting that in *Zeigler Coal* the surety sought to intervene approximately two weeks after *Old Ben Coal* was decided, not over a year later, as is the case here. Too, in *Zeigler Coal* the surety was not, as in this case, the proponent of the proceedings. In other words, the particular problem presented here, that for approximately five years there was no real party in interest prosecuting the modification proceeding at issue, was not present in *Zeigler Coal*.

modification had been abandoned. This behavior, though not commendable, may be legitimate, provided that the delay by Travelers in seeking to intervene in this matter did not prejudice Mr. and Mrs. Crowe.

In evaluating the timeliness of the request by Travelers to intervene in the modification proceeding, the Court recognizes that "the mere lapse of time by itself does not make an application untimely," and instead the Court "must weigh the lapse of time in the light of all the circumstances of the case." 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1916 (3d ed. 1998 & Supp. 2010). In particular, the Court "must consider whether the applicant was in a position to seek intervention at an earlier stage in the case"; thus, "[w]hen the applicant appears to have been aware of the litigation but has delayed unduly seeking to intervene, courts generally have been reluctant to allow intervention." *Id*. (collecting cases). "The most important consideration" in determining if a request to intervene is timely is whether "delay in moving for intervention . . . prejudice[d] the existing parties to the case" and, "[i]f prejudice is found, [intervention] will be denied as untimely." *Id*.

Here there is little serious question that the delay by Travelers in seeking leave to intervene in the modification proceeding was prejudicial. For approximately three years, while the modification proceeding was artificially, and improperly, kept alive by the ALJs assigned to the matter, Mr. Crowe was obliged to defend

his award of benefits against a phantom litigant.[5] On similar facts, this Court has rejected intervention. *See Larson v. JPMorgan Chase & Co.*, 530 F.3d 578, 583-84 (7th Cir. 2008) (a failure by a pension fund to seek to intervene in a class action until over three years after it knew or should have known of its interest in the proceedings, and after a settlement of the class-wide claims had been reached and judgment on the settlement had been entered, was grounds to deny intervention); *Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 949-50 (7th Cir. 2000) (an Indian tribe's delay in seeking intervention in a lawsuit until more than five years after the tribe's members knew or had reason to know that their interests might be adversely affected by the outcome of the suit was grounds to deny intervention, particularly where the proposed intervention was a belated device to block a settlement of the lawsuit). Travelers, as noted, made a tactical decision not to intervene in this matter until the eleventh hour (at least), and now Travelers will have to live with the consequences of that decision. The BRB's order affirming modification of the award of benefits to Mr. Crowe will be reversed, and this case will be remanded with instructions for the reinstatement of the award.

---

[5] In this connection, it should be pointed out that during the period of some three years when Travelers was on notice of its interest in the modification proceeding, but refused to intervene in the proceeding, counsel for the surety nonetheless were permitted to file briefing in the proceeding.

### IV. Conclusion

It was error for the BRB to refuse to dismiss the modi-
fication proceeding and to permit Travelers to intervene
in the proceeding. Accordingly, the decision of the BRB
is REVERSED, and this matter is REMANDED to the BRB
for remand to the ALJ with instructions to reinstate the
ALJ's 2001 award of black lung benefits to Mr. Crowe.

HAMILTON, *Circuit Judge*. I join Judge Murphy's opin-
ion for the court, reversing for reinstatement of the
award of benefits in favor of the late Mr. Crowe. I write
separately to address a second basis for reversal that is
at least as powerful as that explained by Judge Murphy.

The BRB and the ALJ found that it was consistent with
"justice under the Act" to allow this modification pro-
ceeding to go forward. That determination was based on
a mistake. The mistake led the ALJ and the BRB to create
incentives to encourage employers to refuse to comply
with final payment orders, as required by law. Those
incentives will undermine rather than "render justice
under the Act."

In June 2001, after a decade of litigation in admin-
istrative and judicial proceedings, an ALJ found that
Harold Crowe was entitled to monthly benefits under the

Black Lung Act, as well as $168,000 in back benefits. The ALJ ordered Zeigler Coal to pay those benefits. Zeigler Coal did not appeal any further. It also did not pay as ordered. Instead, it decided to try to start all over again by filing a petition to modify the award. That tactic, indulged by the ALJ and ultimately even encouraged by the BRB, essentially erased the parties' efforts for the preceding decade. In my view, the ALJ and the BRB acted arbitrarily and capriciously by considering a petition to modify a final payment order that the petitioner was willfully and lawlessly disobeying.

Let me be clear: my objection is not to Zeigler Coal's decision to seek modification. As Judge Ripple explains in detail in his dissent, the black lung benefits program prizes accuracy over finality to an unusual degree, incorporating the Longshore and Harbor Workers' Compensation Act's broad modification authority set forth in 33 U.S.C. § 922. See 30 U.S.C. § 932; 20 C.F.R. § 725.310. If Zeigler Coal believed the June 2001 award of benefits was wrong, it was entitled to seek modification. But Zeigler Coal was not legally entitled simply to ignore the final order of payment.

When the final order was issued in June 2001 and was not appealed or stayed, benefits were due to Mr. Crowe. The relevant regulation provides, not surprisingly, that "benefits under the Act shall be paid when they become due." 20 C.F.R. § 725.502(a)(1). Accord, 33 U.S.C. §§ 918, 921(a) (during judicial review, payment of amounts required by an award shall not be stayed pending final decision, unless ordered by the court on

showing of threat of irreparable injury). The regulation then explains: "Benefits shall be considered due after the issuance of an effective order requiring the payment of benefits by a district director, administrative law judge, Benefits Review Board, or court, notwithstanding the pendency of a motion for reconsideration before an administrative law judge or an appeal to the Board or court, except that benefits shall not be considered due where the payment of such benefits has been stayed by the Benefits Review Board or appropriate court." 20 C.F.R. § 725.502(a)(1). The regulation goes on to state: "An effective order shall remain in effect unless it is vacated by an administrative law judge on reconsideration, or, upon review under section 21 of the LHWCA, by the Benefits Review Board or an appropriate court, or is superseded by an effective order issued pursuant to § 725.310 [the modification authority]." *Id.* The pendency of a modification petition does not affect the finality of an award. *Hansen v. Director, OWCP*, 984 F.2d 364, 367 (10th Cir. 1993) (holding for purposes of appellate jurisdiction that "pendency of a motion to modify under § 922 does not destroy the finality of the Board's order"); see also *National Mines Corp. v. Carroll*, 64 F.3d 135, 141 (3d Cir. 1995) (noting for purposes of statute of limitations that, "as a general rule, the mere existence of modification proceedings does not affect the finality of an existing award of compensation").

   Consistent with these provisions of law, the ALJ, the BRB, and Judge Ripple all recognize that Zeigler Coal was violating the law by refusing to pay the final, unappealed, and unstayed payment order. See App. 13 (ALJ decision

stating: "There is no question that [employer] should have commenced the payment of benefits to the claimant when it chose to pursue modification rather than appeal the decision on remand," and describing this as "disregard for the law"); App. 5-6 (BRB decision affirming and finding no basis to disagree on this issue); post at 54 ("there appears to be no significant dispute that the surety's failure to pay benefits while the modification proceeding continued was a violation of law").

Yet the ALJ and the BRB chose to indulge this tactic, and even found it consistent with "justice under the Act." The ALJ explained his reasoning as follows: "However, this disregard for the law worked to the detriment of other coal mining companies rather than the claimant since benefits were paid the claimant by the Department of Labor from the Black Lung Disability Trust Fund which is funded through a tax on the severance of coal." App. 13-14. The ALJ went on to explain that the interest in accuracy over finality and the weight of the (by then liquidated) employer's new evidence showed that modification would serve "justice under the Act." *Id.* at 14. The BRB endorsed this reasoning.

That explanation by the ALJ and BRB was built upon an error that was both factual and legal—a misunderstanding about the consequence of Zeigler Coal's tactic—and it invites employers and their sureties to resist payment indefinitely, until the claimant dies and his heirs give up. If Zeigler Coal did not pay monthly benefits going forward, the trust fund (paid for by other coal companies) would pay, and in fact did pay,

Mr. Crowe. But the ALJ's and BRB's explanation simply overlooked Zeigler Coal's obligation to pay back benefits under the final payment order. Zeigler Coal owed Mr. Crowe more than $168,000 under the final payment order. The fund would not pay back benefits. 26 U.S.C. § 9501(d)(1)(A) (funds from Black Lung Trust fund may be expended for benefits only after a determination of entitlement, not from the original time of disability). Thus the effect of Zeigler Coal's decision to disobey the final payment order was to deny Mr. Crowe the $168,000 in back benefits to which he had been found entitled. The ALJ and the BRB overlooked this central reality when they erroneously found that Zeigler Coal's disregard of the law hurt only other coal companies rather than Mr. Crowe and his family. When an administrative agency has made such an error, its order may not stand. *E.g., SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("an order may not stand if the agency has misconceived the law"); accord, *Shelton v. Old Ben Coal Co.*, 933 F.2d 504, 508 (7th Cir. 1991) (reversing denial of black lung benefits where BRB applied wrong legal standard).

Zeigler Coal's decision not to obey the final payment order was lawless but easy to understand. The law provides that a modification order "shall not affect any compensation previously paid," with exceptions not relevant here. 33 U.S.C. § 922. Zeigler Coal knew that if it complied with the final payment order, as it was required to do, and later won a modification, it could not recover the money it had paid to Mr. Crowe under the final payment order.

What to do? The answer for Zeigler Coal was obvious, at least if the BRB was willing to indulge such lawless behavior. By refusing to pay under the final payment order while pursuing a modification, Zeigler Coal delayed payment of back benefits indefinitely, shifted the cost of current monthly benefits to the trust fund, denied Mr. Crowe the back benefits he had been awarded, and forced him to litigate for years more.

If the BRB is willing to consider a modification petition by an employer that is refusing to comply with the BRB's own final payment order, employers in many cases will have a strong financial incentive to pursue that same lawless course. The BRB's tolerance encourages employers to try to delay initial benefit determinations as long as possible, while making minimal efforts to defend the cases on the merits. Then, if they lose with a sparse record that would never support a reversal on judicial review, they can decline to appeal, refuse to pay, and seek modification. That course renders all of the claimants' and the black lung benefits system's efforts up to that point a nullity.

For the employer, it's a no-lose proposition, but it imposes costs on everybody else involved in the program. (1) The intended beneficiaries and their families are denied the full benefits they are entitled to receive, and must keep litigating indefinitely. (2) The trust fund paid for by the whole industry picks up the tab for ongoing monthly benefits. (3) The BRB and its administrative law judges must entertain routine petitions to modify by scofflaw employers. If modification is granted,

the employer is way ahead. If modification is eventually denied, the employer is no worse off than it was when it first lost. The BRB's tolerance of this tactic will impose even heavier burdens and longer delays on a program already known for decades-long litigation. An administrative practice that creates such incentives is arbitrary and capricious, and cannot serve the interests of "justice under the Act."[1]

In response to this reasoning, Travelers makes three principal points, but they are not persuasive. First, it tries to characterize Zeigler Coal's actions as a refusal to pay only "interim" benefits. But there was nothing "interim" about the benefits awarded under the final payment order in 2001. Second, Travelers points out that the law provides a mechanism for enforcing payment orders, in 33 U.S.C. § 921(d), which allows the government or a beneficiary to apply for enforcement of the award in a district court. That's true, and our record does not indicate why Mr. Crowe or the government did not seek enforcement of this final payment award sooner. But the existence of one costly enforcement mechanism— federal litigation—does not prevent the BRB from using other sensible policies to insist that its orders be obeyed.

Third, Travelers argues that modification is intended to be readily available to all parties and "not subject

---

[1] As Judge Ripple explains, the principle that a modification should "render justice under the act" stems from the Supreme Court's decision under the LHWCA in *O'Keeffe v. Aerojet-General Shipyards, Inc.*, 404 U.S. 254, 255-56 (1971).

to arbitrary limitations." Appellee's Br. 23. With respect, nothing in the approach I would take on this issue is inconsistent with that general point. The rule I would apply—refuse to entertain a petition to modify when the petitioner is disobeying a final payment order— is comparable to similar rules that courts often apply to parties who disobey their orders.

For example, parties who are subject to an erroneous and even an unconstitutional injunction must obey that injunction while they seek to have it reversed or modi-fied. The fact that the injunction was erroneous or uncon-stitutional is not a defense against contempt sanctions. *E.g.*, *Walker v. City of Birmingham*, 388 U.S. 307 (1967) (affirming criminal contempt convictions for violations of temporary injunction that blocked civil rights demonstration). Simi-larly, a convicted prisoner who escapes from prison and becomes a fugitive can expect that his pending appeal of his conviction will be dismissed, regardless of the strength of his arguments on the merits, and even if he might be innocent. *E.g.*, *Ortega-Rodriguez v. United States*, 507 U.S. 234, 239-42 (1993) (collecting cases). A party to a civil case who willfully disobeys court orders of any kind, such as those enforcing discovery obligations, can expect dismissal or a default judgment as a sanction, no matter the strength of her claims or defenses. In these situations, courts recognize that if they tolerate willful disobedience of their orders, and if they leave their doors and processes open to those who would flout their authority, their orders will not be obeyed. Their duties to other parties and their own institutional obligations require such strong sanctions, given sufficient provocation.

Analogous principles apply here, notwithstanding the different balance between finality and accuracy that has been struck under the Black Lung Benefits Act. The issue here is not the accuracy or finality of BRB decisions, but the integrity of those decisions. By refusing to consider a petition to modify by a party who is willfully disobeying a final payment order, the BRB would promote justice under the Act. Employers would have a strong incentive to litigate original claims vigorously, if they want to contest them, and a strong incentive to comply with final payment orders. In this case, however, the BRB tolerated such willful disobedience of the final payment order. The result is to encourage such disobedience of the BRB's own final payment orders, to reward even more prolonged and wasteful litigation, and to put more burdens on beneficiaries and their families, on other employers who honor their obligations (and may now feel they have been taken for fools by doing so), and on the entire Black Lung Benefit Act administrative apparatus.

The best argument against my view is that explained so well by Judge Ripple in his dissent: the ALJ and BRB have the authority to refuse to consider a petition for modification that is an abuse of the process, see *Old Ben Coal Co. v. Director, OWCP (Hilliard)*, 292 F.3d 533, 547 (7th Cir. 2002) (acknowledging possibility but holding that agency abused discretion by refusing to consider petition to modify filed after claimant died), but their task is to balance many competing values and policies in making such decisions; courts should leave that balancing to the sound discretion of the ALJ and the

BRB. Judge Ripple sees no abuse of that discretion here, especially when viewed in hindsight, when we know that after nearly another decade of litigation, the ALJ changed his mind about Mr. Crowe's eligibility for benefits.

The general point about the roles of the ALJ and BRB is correct, and in other contexts they are entitled to substantial leeway in exercising that discretion. Accord, *Hilliard*, 292 F.3d at 547; *id.* at 554-55 (Wood, J., dissenting) (arguing for deference to agency's decision to deny modification to avoid piecemeal litigation that would exhaust claimants' resources). I respectfully disagree, however, as applied to the problems posed by this lawless, willful refusal to comply with a final payment order. First, the ALJ and BRB justified their decisions by erroneously overlooking the effect that the employer's tactic had on the claimant. More fundamental, the incentives created by the BRB's approach to this case are simply not consistent with the purposes of the Black Lung Benefits Act. While the BRB may exercise discretion in such matters, the employer's tactic of refusing to pay as ordered while also invoking the modification remedy was so corrosive that it required a much stronger response than the verbal tut-tut administered by the ALJ. Far more meaningful than those mere words was the decision to give the employer (now its surety) all the rewards it could hope to achieve by this cynical and cold-blooded tactic. The BRB has allowed its understandable desire for accuracy to be twisted here into a tool to defeat the purpose of the statute.

I also do not believe that the question should be approached from the perspective of what the ALJ and BRB learned about the merits of the underlying issue over the long course of the modification proceedings. The relevant perspective is the time the scofflaw employer *files* the petition for modification. That's when the ALJ must decide whether to entertain the proceeding at all, before he or she knows what the new evidence might show. By the same token, a court deciding whether to punish parties who disobeyed a temporary injunction does not wait until the ultimate merits of the injunction are resolved, and an appellate court deciding whether to dismiss an appeal by a fugitive-defendant does not consider full briefing on the merits.

In the end, I do not know whether Mr. Crowe suffered from black lung disease or not. ALJs and doctors who are much better suited to answer that question have disagreed over the past 20 years. What I do know is that a final decision was made in 2001 and Mr. Crowe's employer was ordered to pay benefits to him. The employer unlawfully refused, and ever since then, the agency has been indulging this refusal to comply with its own order, thereby encouraging others to do the same. That approach simply is not consistent with "justice under the Act." For this reason, as well as that explained by Judge Murphy, I concur in the remand of this case.

RIPPLE, *Circuit Judge*, dissenting.  The Black Lung
Benefits Act, 30 U.S.C. §§ 901-45, and the regulatory
scheme that accompanies it, create a complicated process
for adjudicating benefits claims by coal industry em-
ployees who become disabled as a result of their em-
ployment. As we have noted on numerous occasions,
in creating this system, Congress deliberately prized
accuracy over finality. The statute accomplishes this
task by allowing agency reexamination of claims to a
degree far exceeding the norm in our judicial system.[1]

In the case before us, it took the agency and the courts
more than twenty years to assess the facts of Harold
Crowe's claims and to reach the ultimate conclusion
that he was not entitled to benefits under the Act. In
those years, the agency has taken various positions on the
factual and legal issues at stake, and the party opposing
the benefits claim has changed from the employer coal
company, to an unknown entity litigating in the name
of the now-bankrupt coal company, to a surety-holder,
which, we learned at oral argument, claims in other
litigation now pending not to hold the surety in this case.
Given this "long and tortuous history,"[2] I understand
my colleagues' aversion to a system that allowed the

---

[1] *See Jessee v. Dir., OWCP*, 5 F.3d 723, 725 (4th Cir. 1993) ("[T]he
'principle of finality' just does not apply to Longshore Act and
black lung claims as it does in ordinary lawsuits." (citing *Banks
v. Chicago Grain Trimmers Ass'n*, 390 U.S. 459, 461-65 (1968))).

[2] *Old Ben Coal Co. v. Dir., OWCP* (*Hilliard*), 292 F.3d 533, 535
(7th Cir. 2002).

agency and the defending party to pursue the course each has and a result that denies benefits to Harold Crowe's widow and children. I nevertheless must conclude that the statute, the regulations and our precedent allow such a course. Consequently, I respectfully must disagree with the court's conclusion that the agency was required to dismiss the modification petition. Because I further conclude that Mrs. Crowe's additional arguments fail, I would deny the petition.

# I

The present case implicates a relatively unique and, to a significant degree, counter-intuitive modification authority of administrative authorities responsible for the implementation of the black lung benefits program. That authority is best understood in the context of the overall regulatory scheme. I therefore preface my analysis of this case with a sketch of the overall administrative structure.

## A. The Black Lung Benefits Act and Amendments

In 1969, responding to a single mine explosion that killed seventy-eight miners in Farmington, West Virginia, and unrelated mine accidents in the following year that took the lives of an additional 170 miners, Congress enacted the first Federal Coal Mine Health and Safety Act ("FCMHSA"), Pub. L. No. 91-173, 83 Stat. 742 (1969) (codified as amended at 30 U.S.C. §§ 801-900). The FCMHSA aimed to "protect the health and safety

of coal miners, and to combat the steady toll of life, limb, and lung, which terrorizes so many unfortunate families." H. Rep. No. 91-563 at 2 (1969), *reprinted in* 1969 U.S.C.C.A.N. 2503, 2503. In addition to a series of reforms in the previous federal mine safety program, the FCMHSA created the Nation's first federal entitlement program for miners. The legislators believed the program to be a "satisfactory means of compensating miners who were incapacitated by respirable diseases, as well as the surviving widows and children of miners who had died from the dread black lung." S. Rep. No. 92-743 at 3 (1972), *reprinted in* 1972 U.S.C.C.A.N. 2305, 2307 (describing the 1969 FCMHSA). The FCMHSA vested responsibility for administering the program in the Social Security Administration ("SSA"); benefits were paid from SSA's general funds. Less than three years after the Act's passage, claims for benefits were more than three times the anticipated levels. Even so, the rate of denials by the SSA for benefits under that first act was more than fifty percent nationwide. *Id.*

In response, Congress modified and expanded substantially the program in the Black Lung Benefits Act of 1972 ("the Act"), Pub. L. No. 92-303, 86 Stat. 150 (codified as amended at 30 U.S.C. §§ 901-45). In this "remedial law," Congress attempted to ensure that "the cases which should be compensated[] will be compensated. In the absence of definitive medical conclusions there is a clear need to resolve doubts in favor of the disabled miner or his survivors." S. Rep. No. 92-743 at 11, 1972 U.S.C.C.A.N. at 2315.

In the 1972 Act, Congress gave specific direction to both the SSA, which maintained its jurisdiction over pre-1974[3] claims, and to the Department of Labor, which handled new claims filed in 1974 and, later, the administrative responsibilities for the expansion of the federal entitlement program. These steps were taken in part because of the perception that the earlier program had failed to compensate in appropriate cases. The 1972 Act broadened coverage by requiring the agencies to consider certain types of evidence in making benefits determinations, including lay testimony; it also prohibited the agencies from relying on negative x-rays as the exclusive evidence to deny a claim. *See* 30 U.S.C. § 923(b). It further expanded the definition of total disability due to pneumoconiosis[4] to reach more miners and broadened the presumptions favoring the miner. *See id.* § 902(f).

The 1977 amendments to the 1972 Act further liberalized the standards for establishing eligibility by

---

[3] The 1972 Act moved the transition from SSA to the Department of Labor from December 31, 1972, to December 31, 1973. Pub. L. No. 92-303, § 5(2), 86 Stat. at 155. Much of the SSA's remaining authority with respect to the pre-1973 claims eventually was transferred to the Department of Labor in 1997. *See* Black Lung Consolidation of Administrative Responsibility Act, Pub. L. No. 107-275, 116 Stat. 1925 (2002) (codified as amended at 30 U.S.C. §§ 921-24).

[4] "The term 'pneumoconiosis' means a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment." 30 U.S.C. § 902(b) (addition by the Black Lung Benefits Reform Act of 1977, *see* 20 C.F.R. § 725.1(f)).

expanding the definition of miners, extending additional presumptions in favor of claimants and creating the Black Lung Disability Trust Fund. *See* Black Lung Benefits Reform Act of 1977, Pub. L. No. 95-239, 92 Stat. 95 (1978) (codified as amended in scattered sections of 26 U.S.C., 29 U.S.C. and 30 U.S.C.). In addition, the Act required the Department of Labor to reexamine pending and *already denied* claims at the request of the claimant under standards at least as generous as those in effect in 1973. *Id.* §§ 2(c), 15. Even as the substantive grounds and the presumptions for entitlement expanded, the Act continued to place the burden on the miner to prove the existence of pneumoconiosis, and the legislative history made apparent that "a mere showing of a respiratory or pulmonary impairment will not be sufficient to establish a claim for benefits." S. Rep. No. 92-743 at 13, 1972 U.S.C.C.A.N. at 2317. After this series of increasingly generous amendments to the original entitlement program, and largely in response to mounting deficits in the Trust Fund, the Act was amended in 1981 to create more restrictive eligibility requirements.[5] Specifically, three out of the five presumptions in favor of claimants were eliminated; rules binding the agency to accept certain positive x-ray diagnoses of pneumoconiosis were eliminated. *See* Black Lung Benefits Amendments of 1981, Pub. L. No. 97-119, Title II, 95 Stat. 1635, 1643 (1981) (codified as amended in scattered sections of 30 U.S.C.); *Newman v. Dir., OWCP*, 745 F.2d 1162, 1164 n.2 (8th Cir. 1984).

---

[5]  *See* John S. Lopatto III, *The Federal Black Lung Program: A 1983 Primer*, 85 W. Va. L. Rev. 677, 678 & nn.10-11 (1983).

In addition to the Act's substantive provisions, it also provided for distinct administrative structures and procedural rights for claimants. Beginning with the original 1969 Act, the program incorporated by reference many of the adjudication procedures under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901-50 ("the Longshore Act"), also administered by the Department of Labor. Those procedures include the right to a trial under the Administrative Procedures Act and to both administrative and judicial appeals. *See* 33 U.S.C. §§ 919(d), 921; 5 U.S.C. § 554. In addition, and particularly relevant to the case before us, since 1927, the Longshore Act has included a provision permitting modification of a final decision on benefits entitlement. *See* 33 U.S.C. § 922. By the time the procedures of the Longshore Act had been incorporated into the black lung program, the modification provision allowed any party, or the district director on his own initiative, "at any time prior to one year after the date of the last payment of compensation, whether or not a compensation order has been issued, or at any time prior to one year after the rejection of a claim," to seek review of "a compensation case in accordance with the procedure prescribed (for original claims)," for the purpose of modifying the order. *Id.*[6] The grounds for modification are "a change in conditions or . . . a mistake in a determination of fact." *Id.*

---

[6] For a history of the evolution of this provision to permit modification in progressively more circumstances, see *Banks v. Chicago Grain Trimmers Ass'n*, 390 U.S. 459, 461-64 (1968).

The legislative history for the 1969 FCMHSA offers nothing specifically to explain the choice to incorporate the Longshore Act's procedures, much less the modification authority. *See* H.R. Rep. No. 91-161 (1969) (Conf. Rep.), *reprinted in* 1969 U.S.C.C.A.N. 2578, 2606 (stating, without elaboration, that "the applicable provisions of the [Longshore] act of March 4, 1927, as amended, shall be applicable" to claims filed on or after January 1, 1973). The foregoing account demonstrates that there have been significant changes to the substance of the Act, many of which expanded the Act's scope of coverage. A constant, however, has been the Act's integration of the Longshore Act's procedures to the long-term black lung benefits claims, including the modification authority.

## B. The Regulations

Pursuant to the Act, the Secretary of Labor[7] developed an extensive regulatory scheme. In brief, in its current form, it requires claims to be presented first to a district director in the Office of Workers' Compensation Programs ("OWCP") of the Department of Labor, who will issue an order regarding entitlement to benefits. The claimant or the operator (or its successor) may petition

---

[7] Earlier regulations were promulgated, of course, by the Secretary of Health, Education, and Welfare, under the authority to adjudicate claims from the initial application period. *See Pittson Coal Group v. Sebben*, 488 U.S. 105, 108-11 (1988) (discussing generally the historical series of regulations by the two departments and their relationships to one another).

for a trial before an ALJ, review by the Benefits Review Board ("BRB" or "Board") and review in an appropriate Court of Appeals. *See* 20 C.F.R. §§ 725.400-83 (Subparts E and F).

With respect to modification, the regulations in place in 2000, at the time of the modification petition in the present case, added little beyond that specified in the statute. *See* 20 C.F.R. § 425.310 (2000).[8] In addition to stating that the "modification proceeding[] shall be conducted in accordance with the provisions of this part as appropriate," the applicable regulations specifically provide that "[a]dditional evidence may be submitted by any party or requested by" the decisionmaker.[9] *Id.* § 725.310(b) (2000).

---

[8] The regulations were amended substantively in December 2000 to set limits on the quantity and quality of evidence that can be submitted in a modification proceeding. However, those limitations were not applicable to claims pending on January 19, 2001, as Mr. Crowe's was. *See* 65 Fed. Reg. 79920, 80057, 80069 (Dec. 20, 2000); 20 C.F.R. § 725.2(c) (2010); *Zeigler Coal Co. v. OWCP*, 490 F.3d 609, 615 n.5 (7th Cir. 2007) (noting that which of the various rules governs a black lung claim depends upon when the initial claim is filed).

[9] The statute provides that the modification authority rests with the "deputy commissioner," a position that is now occupied by the "district director" in the DOL. We have long held that the regulations appropriately extend modification authority to the ALJs that conduct hearings when the mistake of fact alleged was committed by an ALJ. *See Eifler v. OWCP*, 926 F.2d 663, 665-66 (7th Cir. 1991).

## C. Precedents Interpreting the Modification Authority

The Supreme Court has long understood the modification provision in the statute to convey broad authority. In *Banks v. Chicago Grain Trimmers Ass'n*, 390 U.S. 459, 461-64 (1968), a claimant filed a second petition for benefits, alleging a completely different theory of liability and different evidence in support of that theory. The court of appeals had rejected the second petition, concluding it was barred by res judicata. The Supreme Court, however, held that the second petition was an appropriate request for modification within the authority granted by the statute. Specifically, the Court acknowledged that among the mistakes of fact the statute permitted the agency to correct was a mistake of *ultimate* fact—i.e., the liability of the employer. It is significant that the broad reading of the modification authority in the Longshore Act in *Banks* predates the decision of Congress to incorporate its procedures into the first black lung program, in the FCMHSA of 1969.

Several years later, in *O'Keeffe v. Aerojet-General Shipyards, Inc.*, 404 U.S. 254 (1971) (per curiam), the Court again interpreted broadly the modification provision:

> [O]n its face, the section permits a reopening within one year "because of a mistake in a determination of fact." There is no limitation to particular factual errors, or to cases involving new evidence or changed circumstances. The [Longshore] Act at one time did authorize reopening only on the "ground of a change in conditions," 44 Stat. 1437, but was amended in 1934 expressly to "broaden

the grounds on which a deputy commissioner can modify an award . . . when changed conditions or a mistake in a determination of fact makes such modification desirable in order to render justice under the act." S. Rep. No. 588, 73d Cong., 2d Sess., 3-4 (1934); H.R. Rep. No. 1244, 73d Cong., 2d Sess., 4 (1934). The plain import of this amendment was to vest [the agency] with broad discretion to correct mistakes of fact, whether demonstrated by wholly new evidence, cumulative evidence, or merely further reflection on the evidence initially submitted.

*Id.* at 255-56. The court of appeals in *O'Keeffe* had refused modification where no new evidence had been presented, concluding that "'the statute simply does not confer authority upon the Deputy Commissioner to receive additional but cumulative evidence and change his mind.'" *Id.* at 254-55 (quoting the Fifth Circuit's opinion). The Supreme Court's reversal of that decision directed that "not only could modification be used to challenge the ultimate determination of liability, but modification also could take place without submission of 'new' evidence." *Old Ben Coal Co. v. Dir., OWCP* (*Hilliard*), 292 F.3d 533, 540 (7th Cir. 2002) (internal citations omitted). *O'Keeffe* did, however, draw on legislative history to require that modification "render justice under the act," 404 U.S. at 255, 256; that principle continues to inform the discretionary determinations made by the agency on modification.

Our own decisions have followed the Supreme Court's direction to interpret the modification provision to

reach broadly with respect to both substance and proce-dure. In *Hilliard*, we reviewed the agency's denial of an employer's modification petition. In denying modi-fication, the ALJ had noted that modification was discre-tionary and subject always to the limitation that it render justice under the Act; specifically, the agency believed that the need to render justice should be "balance[d] . . . against the need for finality in decision making." 292 F.3d at 537 (quotation marks omitted). The agency's language made clear that it was displeased with the employer's tactics in the case before it:

> "The modification provisions of the Act are not intended to allow a party to lay back, and, having received an adverse decision, take a second (or in this case, a third) bite at the apple by gearing up and presenting evidence that it could have pre-sented at the first hearing on the claim. To do so would allow the Employer, under the guise of an allegation of mistake, to retry its case simply because it feels that it can make a better showing the next time around."

*Id.* at 537 (quoting the ALJ opinion). We reversed. Drawing on the Supreme Court precedent and a "wealth of circuit cases," *id.* at 541, we focused on the breadth of the provision and the conscious decision of Congress to elevate accuracy over finality embodied in the modification provision. We reviewed decisions that overturned modified awards and concluded that, although the preference for accuracy could be over-come in some situations by various considerations and

specific interests related to finality could be among them, the "concern for finality simply cannot be given the same weight that it would be given in a regular civil proceeding in a federal district court." *Id.* We noted that abuse of the adjudicatory system was one potential basis for refusing modification, and further concluded that "an ALJ would be entitled to determine that an employer was employing the reopening mechanism in an unreasonable effort to delay payment." *Id.* at 547. In finding that the ALJ in *Hilliard* had failed to ground her decision in the policies of the statute, however, we left the determination of the "universe of actions that overcomes the preference for accuracy" within the sound discretion of the agency, guided by the "justice under the Act standard." *Id.* (internal quotation marks omitted).[10] We specifically ruled that this standard should not be confused with the more amorphous and familiar "interests of justice" standard; the relevant standard directly "cabins the discretion of the ALJ to keep in mind the basic determination of Congress that *accuracy of determination is to be given great weight* in all determinations under the Act." *Id.* (emphasis added).

We further noted that the statute provides a broad timeline for requesting modification by specifying that

---

[10] Indeed, we went so far as to say that, "[t]o the extent that an ALJ determines that there are important reasons grounded in the language and policy of the Act that overcome the preference for accuracy, that determination should not be disturbed." *Hilliard*, 292 F.3d at 547.

requests need only be filed within one year of a claim's rejection and including no limitation on subsequent requests. We cited with approval cases from other circuits that had concluded that the "rejection of a claim" language in § 922 includes rejection of another modification petition itself, thereby lengthening substantially the amount of time in which a claim could be pending. *Id.* at 540-41 (citing cases from the Third and Fourth Circuits).

## II

Our review task is well-defined. On petition for review of a decision of the Benefits Review Board in proceedings under the Black Lung Benefits Act, 30 U.S.C. §§ 910-45,

> our task is to review the ALJ's decision which the Board affirmed. We do so under a deferential standard of review: We will not overturn the ALJ's decision if it is rational, supported by substantial evidence and consistent with governing law. We affirm an ALJ's factual findings if they are supported by relevant evidence that a rational mind might accept as adequate to support a decision. We do not reweigh the evidence, resolve inconsistencies in the record, make credibility determinations, or substitute our inferences for those drawn below. Though we defer to the ALJ's factual determinations, we review questions of law *de novo*.

*Roberts & Schaefer Co. v. Dir., OWCP*, 400 F.3d 992, 996 (7th Cir. 2005) (internal quotation marks and citations omitted). "After this examination, we then review the Board's decision to determine whether the Board adhered to its scope of review and whether it committed any legal error." *Blakley v. Amax Coal Co.*, 54 F.3d 1313, 1318 (7th Cir. 1995).

Florence Crowe, widow of Harold Crowe, challenges the decision of the ALJ, affirmed by the Benefits Review Board, reversing an award of benefits to Mr. Crowe. She raises three arguments in support of remand to the agency. First, she contends that the action should have been dismissed when the coal operator was dissolved and no other party assumed responsibility for the modification petition. Second, she claims that the ALJ erred in concluding that modification would serve justice under the Act. Finally, she claims that an earlier decision of the Benefits Review Board erroneously remanded the case back to the ALJ and that we should review and reverse *that* earlier decision. My colleagues premise their grant of the petition on Mrs. Crowe's first reason. Because I find no merit in that argument, I shall discuss as well her alternate arguments.

### A. Requests for Dismissal

As the court recounts, Mr. Crowe requested that the modification petition pending in his case be dismissed when Horizon Natural Resources, the successor in interest to Zeigler, Mr. Crowe's former employer, was

dissolved in bankruptcy. Indeed, he moved to dismiss when no party had intervened in 2005, and his motion was denied by the Board. Later, when Travelers, the holder of a surety from Zeigler, moved to intervene, Mr. Crowe opposed the motion and has continued his objection throughout the proceedings.[11] Mrs. Crowe now contends that it was error for the ALJ and the Board to refuse dismissal of the modification petition when it had no named proponent and to allow Travelers's intervention in 2009. I consider those arguments in turn.

At the outset, it should be noted that, in the dissolution proceeding, the bankruptcy court entered an order relevant to the present matter. That court directed that all pending black lung claims against debtors (i.e., former coal operators whose interests had passed to Horizon)

> shall not be dismissed but instead, allowed to proceed to final adjudication with the applicable debtors as parties. Finally adjudicated claims that result in benefit awards will not be enforced against the Debtors but rather will form the basis for collection from any other responsible parties therefore, including without limitation, the Debtors['] sureties under the [black lung statute].

---

[11] At oral argument, it became apparent that Travelers is contesting its status as the surety in other litigation. For ease of reading, I continue to refer to it as the surety holder, as it has not been determined to be otherwise so far as we have been made aware.

*Old Ben Coal Co. v. Dir., OWCP*, 476 F.3d 418, 419 (7th Cir. 2007) (involving the Horizon bankruptcy) (modifications in original) (quotation marks omitted).

### 1. Dismissal at the Agency was not Required by our Precedents

The panel majority's decision faulting the agency for failing to dismiss the action rests on two prior cases of this court, which I believe merit detailed examination. First, in *Old Ben Coal Co. v. Director, OWCP* (*Melvin*), 476 F.3d 418 (7th Cir. 2007), a miner had been awarded benefits in a final order of the Board. A bankruptcy then resulted in the dissolution of the employer, but the insurer, who could continue to face liability, sought to challenge the agency decision without becoming a party to it. At the insurer's behest, a petition for review was filed in this court, but in the name of the then-dissolved employer. We dismissed the action. Because neither the insurer nor anyone else had "sought party status," the only entity seeking to invoke our jurisdiction was "the ghost of" the dissolved employer. *Id.* at 420. A non-party (including the surety bond holder) seeking to protect some contingent interest could not "direct[] its lawyer to represent a named party that [by virtue of its dissolution] was not a real party in interest." *Id.* We issued our decision in *Melvin*, which, as noted above, involved the same bankruptcy, in January 2007.

Thereafter, in June 2007, we issued another decision in *Zeigler Coal Co. v. Director, OWCP* (*Griskell*), 490 F.3d

609 (7th Cir. 2007), that also involved the same bank-ruptcy and same surety. We noted in *Griskell* that, in February 2007, Travelers had moved to intervene while that case was pending in our court. We allowed the intervention, although we considered it untimely, noting that Travelers "showed good cause to intervene because, until our decision in [*Melvin*], [Travelers] had no reason to believe that intervention was necessary to protect [its] interest." *Id.* at 610 n.1.

Both *Melvin* and *Griskell* were issued after Mr. Crowe's motion to dismiss before the agency and neither is squarely on point because the issue of party status impli-cated Article III jurisdictional concerns before this court, not the right to proceed before the agency. Nevertheless, they are instructive. We permitted untimely interven-tion in *Griskell* in part because we had concluded that the insurer, relying on the bankruptcy court's order, *had no reason to believe intervention was necessary*. Our ruling suggests that, at least until *Melvin* was issued, an insurer involved in this particular bankruptcy and under the bankruptcy court's order would have been reasonable in its belief that it could litigate in the name of the dissolved employer.

The panel majority's opinion notes that *Griskell* did not "amplif[y] or enlarge[] upon" what it identifies as *Melvin*'s basic holding, that a dissolved entity "was not a real party in interest to a proceeding under the [Black Lung Benefits Act]." Maj. Op. at 16. Our holding in *Melvin*, however, was premised explicitly on the fact that the entity seeking to invoke *the jurisdiction of this*

*court* was a non-existent corporation. It was not that Old Ben ceased to be a real party to a *proceeding under the Act*—it had ceased to exist *at all*; as such, it had nothing to lose or gain from the suit and lacked standing in our court. Although our decision in *Melvin* noted that the surety was entitled to intervene in the administrative proceeding, we did not state that it would have been required to do so; indeed, we also acknowledged that it might have intervened in our court to protect its claimed interests. *Griskell*'s significance is that it explicitly states that the failure to have intervened as a party in interest *prior* to 2007 is not fatal.

When Mr. Crowe's own case is placed against the timeline of our precedents, the reasonableness of the agency's decision not to dismiss the action prior to the formal intervention of Travelers is apparent. Although Mr. Crowe sought dismissal before the ALJ and repeatedly objected before the Board to participation of counsel on behalf of the dissolved employer, he did so before *Melvin* and *Griskell* rejected the respective insurers' course in this court. At the time both *Melvin* and *Griskell* were decided, the Board had issued its order affirming the ALJ's evidentiary conclusion that Mr. Crowe had not demonstrated an entitlement to benefits. However, the Board had remanded the case so that the ALJ could determine whether modification served justice under the Act. The opposing party, still litigating in the name of the bankrupt employer pursuant to the bankruptcy court's order, sought rehearing en banc. The Board did not deny that motion until August 2007, shortly after *Griskell* was decided. The remand order

then placed the case back before the ALJ. At that point, in early 2008, Travelers, the surety holder, filed its first motion to intervene over Mr. Crowe's renewed objection;[12] although that motion was denied, *see* Order of ALJ at 2 n.5 (Jan. 30, 2009), the Board found that denial to have been in error, *see* Order of BRB at 1-2 (Oct. 21, 2009), and permitted intervention in 2009.

In short, Travelers was not engaged in improper conduct when it waited from the time of the Horizon bankruptcy until 2009 to become a party to the case. The course that the employer's counsel chose was in conformity with existing law and a court order prior to *Melvin* and *Griskell*. When, in 2007, those cases made clear that the appropriate way of proceeding was not to continue the proceedings in the name of the employer, but by formal substitution of the surety, Travelers took its first opportunity to seek intervention upon remand of the case. The proceedings continued essentially uninterrupted by the issue of who actually litigated the modification petition. The relevant question in the modification has always been substantive entitlement to benefits based on medical evidence.

---

[12] The panel majority opinion notes that the surety in *Griskell* sought to intervene just weeks after *Melvin* was issued, and Travelers first motion in this case was a year after the same decision. But the cases were at very different stages of litigation at that time. *Griskell* was already on petition for review in our court, and *Melvin* would have required dismissal absent intervention, as a matter of jurisdiction. In the present case, as we already have discussed, the matter was sitting awaiting a decision on a motion for rehearing before the Board.

In sum, the legal authorities did not require dismissal, and the administrative record simply does not establish the kind of misconduct or abandonment that would have required the ALJ to dismiss the case in the reasonable exercise of his discretion.[13]

### 2.   The Agency Acted within its Discretion in Permitting Intervention

After rejecting Travelers's argument that the timing of its intervention was reasonable in light of the development of the law of our circuit, the panel majority notes that Travelers's "behavior, though not commendable,

---

[13] The panel majority supports its decision on an interpretation of the statute and regulations that it believes required dismissal even without our guidance in *Melvin* and *Griskell*. Specifically, the majority takes the position that the statute and regulations require there to be a party in interest and direct the ALJ to dismiss a case when it has been abandoned by the proponent. The provisions the majority identifies, however, are not applicable to the situation at hand. The statute requires that "the application" for modification be made by a party in interest, 33 U.S.C. § 922, and it was so made in this case, by Zeigler, prior to its dissolution. Although, as the panel majority notes, claims may be denied due to abandonment under the regulations, the abandonment regulation cross-references another section, detailing the reasons for which such a denial would be appropriate; that cross-referenced section mentions only actions *by a claimant* that result in abandonment, not by an opponent of a claim. *See* 20 C.F.R. § 725.310(c) (referencing § 725.409).

may be legitimate, provided that the delay . . . did not prejudice Mr. and Mrs. Crowe." Maj. Op. at 18. As the panel majority notes, there is no specific requirement in the statute or the regulations requiring intervention to occur within a specific time frame, but the court will "suppose that the regulations contemplate that an insurer . . . will seek intervention in a timely manner." *Id.* at 15. In determining whether intervention should be permitted in this case, the panel majority cites authorities, not specific to the agency context, describing the factors that courts should consider in determining whether to permit a delayed intervention. After noting that chief among those factors is the prejudice suffered by the opponent, the panel majority concludes that there was substantial prejudice to the Crowes in this case and reverses.

Respectfully, I cannot agree. Given the substantial discretion the agency enjoys in the conduct of proceedings under the Act, it is not our role to engage in essentially de novo review of the intervention question. Nor do I believe that "'all of the circumstances of the case,'" Maj. Op. at 18 (citing 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1916 (3d ed. 1998 & Supp. 2010)), demonstrate that the intervention should have been denied. Although the Crowes were required to continue participating in the proceedings over a period of several years, the majority identifies no specific prejudice to their case. First, the majority acknowledges that briefing continued with counsel for the surety participating, albeit in the name of the employer. *See* Maj. Op. at 19 n.5. Second,

the record in this case was complete by the time that Horizon was dissolved; the ALJ did not permit the introduction of additional evidence, but adjudicated the petition with the evidence originally submitted by Zeigler. *See* Decision and Order of ALJ at 4-5 (July 1, 2005) (declining to reopen the record for additional evidence). Finally, in the period of time after *Melvin* and *Griskell* demonstrated that intervention was appropriate, the case was essentially stagnant before the agency for a period of several months, awaiting a decision on already filed motions. Once the final remand order was issued, Travelers moved to intervene within a reasonable time frame, and, again, the Crowes suffered no direct prejudice in the interim.

The Board acted within the bounds of its discretion when it permitted Travelers to intervene. Nothing in the statute or case law required a different result. It was understandable for the insurer to believe that it could proceed in the former employer's name until our decisions in *Melvin* and *Griskell*. Further, given that no specific prejudice resulted for the Crowes, it was within the discretion of the ALJ to allow the case to continue under the employer's name and was further within the discretion of the Board to permit the intervention in 2009.

## B. Justice Under the Act

Mrs. Crowe next contends that the ALJ erred in concluding that modification would serve justice under the Act. Specifically, she avers that the employer behaved

improperly in refusing to pay benefits under the final award. Further, she contends that the ALJ's decision was capricious because the ALJ already had concluded, at earlier stages in the proceeding, that the employer had failed to act with diligence.[14]

As we have noted, the statute vests an ALJ with broad discretion in modification proceedings. That discretion is cabined by the requirement that modification must serve justice under the Act. *O'Keeffe*, 404 U.S. at 255, 256. As we also have noted, that principle is tied to the Act's preference for accuracy above finality in most circumstances. Although an ALJ is *entitled*, in various circumstances, to conclude that a party's conduct is such that a modification in its favor is improper, *see Hilliard*, 292 F.3d at 547, Mrs. Crowe has not invited our attention to any case in which we have required such a conclusion.

It is important to remember the posture at which this question arises in this case. The ALJ in the modification proceedings had concluded that, on the merits and in consideration of all the evidence before him, Mr. Crowe's claim to black lung benefits should fail. Mr. Crowe, and now Mrs. Crowe, seek to employ the justice under the Act standard to contend that, despite that finding,

---

[14] Specifically, in a procedural order issued in 1994 and another in 2001, the ALJ denied the employer's requests to introduce evidence. In both denials, the ALJ noted that the employer previously had had ample time to submit evidence, but had failed to do so.

Mrs. Crowe should continue to receive benefits because of the conduct of the employer. Certainly, the proceedings in this case are protracted and the matter might well have been resolved much sooner had the employer better defended the case at the outset. Moreover, there appears to be no significant dispute that the surety's failure to pay benefits while the modification proceeding continued was in violation of law. *See* 20 C.F.R. § 725.502(a)(1).[15] Nevertheless, the ALJ was in the best position to determine whether modification served justice under the Act. We already have said that, "[t]o the extent that an ALJ determines that there are important reasons grounded in the language and policy of the Act that overcome the preference for accuracy, that determination should not be disturbed." *Hilliard*, 292 F.3d at 547. The same is true when the ALJ finds that the preference for accuracy outweighs competing considerations in a given case.

Here, the ALJ properly considered Mrs. Crowe's arguments that justice under the Act would not be served by denial of a modification that he already had concluded was warranted by the evidence. He acknowledged the unlawfulness of the employer's conduct, but found it did not work a manifest injustice to Mr. Crowe

---

[15] Although we noted in *Hilliard* that an employer's attempt to *abuse* the adjudicatory process to delay payment would justify denial of modification, 292 F.3d at 547, there is no allegation that this was the employer's course in this case. Modification was not sought for delay—it was sought for a redetermination of the merits with additional evidence.

because his benefits were paid by the Trust Fund during the litigation.[16] The ALJ considered the diligence of the employer and the quality of evidence produced in the modification proceeding.[17] His opinion makes clear that,

---

[16] On the matter of nonpayment, the ALJ wrote:

> I do not believe that the employer's delay in the payment of benefits to the claimant is a significant enough factor to justify denying employer's request for modification. It does not establish that modifying the previous award of benefits would be a "manifest injustice," especially considering the "statutory preference for accuracy of benefits determination." *Old Ben Coal Co. v. Director, OWCP [Hilliard]*, 292 F.3d 533, [546] (7th Cir. 2002). In this regard, I note that I agree that the employer's newly developed medical evidence unquestionably demonstrates that I made mistakes of fact in finding the evidence was sufficient to prove the miner has pneumoconiosis and is totally disabled by the disease.

Decision and Order of ALJ at 6 (Jan. 30, 2009) (parallel citation omitted).

[17] On the matter of diligence, the ALJ conducted a brief review of the parties' litigation strategies throughout the decades-long proceeding. In the ALJ's view, the employer had been justified in failing to put forward a vigorous defense in the first instance, because the claimant's evidence in the initial proceeding was "weak," and the agency's approval of that strategy was evident in the claim's denial. Decision and Order of ALJ at 4 (Jan. 30, 2009). After the case was remanded by the Seventh Circuit for reconsideration of "the medical evidence

(continued...)

considered in whole, the employer's conduct in pursuing modification was not sufficiently problematic that it should upset the "statutory preference for accuracy of benefits determination." Decision and Order of ALJ at 6 (Jan. 30, 2009) (internal quotation marks omitted).

In sum, it was within the discretion of the ALJ to conclude that the interest in accuracy, which occupies a unique place in black lung litigation, should not be outweighed by the employer's—or the insurer's—conduct in this litigation.

## C.  Review of Earlier Board Decision

Finally, Mrs. Crowe asks us to review the Board's decision of August 24, 2004, in which it remanded an ALJ's previous award of benefits, concluding that the ALJ made an error of law. In that decision, the Board

---

[17] (...continued)

under a different standard of proof," *id.* at 4-5, the ALJ noted that the employer sought to introduce further evidence; the ALJ further noted that he had denied that request, "despite the diligence of employer's counsel to convince [him] otherwise." *Id.* at 5. Finally, the ALJ credited the employer for seeking modification rather than appealing the award of benefits: "I find this to be a diligent decision, because an appeal may have proved futile to the employer based on the existing evidentiary record." *Id.* Within the modification proceeding, the ALJ found that the newly developed record was "replete with evidence developed by the employer regarding the state of the claimant's medical condition." *Id.*

determined that the ALJ had failed to provide a medical reason for crediting the testimony of the single treating physician who diagnosed pneumoconiosis over the employer's physicians who, upon reviewing Mr. Crowe's medical records, determined that pneumoconiosis could not be diagnosed. The parties have submitted various arguments about the reviewability of this decision, a remand order that has twice been succeeded by additional orders of the Board on the merits.

As we noted at oral argument, it is self-evident that our jurisdiction extends to questions addressed in interlocutory orders of the relevant agency or court.[18] Therefore, the difficulty for Mrs. Crowe on this issue is not, as Travelers contends, that we cannot reach the prior Board decision because it is not a final order. Rather, the difficulty is that the Board's legal determination did not control the ALJ's conclusion on remand. The remand simply provided the ALJ an oppor-

---

[18] *Matter of Xonics, Inc.*, 813 F.2d 127, 130-31 (7th Cir. 1987) ("Adverse decisions on interlocutory matters may be saved up to be appealed at the end of the case. . . . We have an appeal from the only 'final' decision, and in such an appeal all questions are open."); 15A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3905.1 ("The prohibition against immediate appeal of most pretrial and trial orders established by the final judgment rule is offset by the rule that once appeal is taken from a truly final judgment that ends the litigation, earlier rulings generally can be reviewed.").

tunity to reexamine the evidence.[19] In doing so, the ALJ concluded that the prior award was erroneous in its determination that the evidence supported a diagnosis of pneumoconiosis. Although noting the basis for the Board's remand, the ALJ's focus was instead on a comprehensive reexamination of the record.

In short, we need not decide whether the Board misstated our precedents when it remanded so that the ALJ could provide a medical reason for preferring the treating physician's diagnosis. Any such error would be harmless in the present case because, in the remanded proceedings, the ALJ's total reevaluation of the claim led to the conclusion that the record did not support Mr. Crowe. That determination was based not on the Board's medical reason standard, but on a complete review of the medical evidence from top to bottom.

Consequently, I must conclude that the ALJ and the Board acted within their discretion in denying Mr. Crowe's motion to dismiss and in permitting delayed intervention by Travelers. Further, given the Act's strong preference for accuracy in benefits deter-

---

[19] The complete reexamination of the evidence was within the scope of the remand order, which vacated the ALJ's "assessment of the evidence" and "instruct[ed] him on remand to consider the employer's modification request in accordance with the standard set forth in *Hilliard*." Decision and Order of Board at 6 (Aug. 24, 2004). In the Board's view, *Hilliard* required the agency to "give great weight to accuracy." *Id.* at 5.

minations, the ALJ did not abuse his discretion in determining that justice under the Act was served by the modification. Finally, although we may review interlocutory orders of the Board, any legal error in its 2004 ruling proved inconsequential; the ALJ's opinion completely reevaluated the evidence and made clear that he believed the record did not support Mr. Crowe's claims. Accordingly, I would deny the petition.